Littleton, Judge,
delivered the opinion of the court:
The plaintiffs sue to recover $493,378.41, with interest, as an overpayment of corporation income and excess profits taxes and interest for the period from August 1, 1950, to October 31, 1950. There are two issues. The first issue is whether the Commissioner of Internal Revenue properly included certain future commissions in the income of the Telephone Directory Advertising Company, a corporation, for its final taxable period. The second issue is whether the Commissioner properly included the proceeds from the sale of certain assets in the income of the Telephone Directory Advertising Company.
The facts relating to the first issue may be summarized as follows: The Telephone Directory Advertising Company (hereinafter referred to as plaintiff) kept its books and filed its tax returns on an accrual method of accounting. The plaintiff filed its corporation tax returns on the basis of fiscal years ending July 31, and filed its final corporation tax return for the taxable period beginning August 1, 1950, and ending October 31,1950.
*673 Tbe plaintiff, from its inception in 1913 until its liquidation on October 31,1950, was engaged in the business of selling and scheduling advertising for publication in telephone directories to be issued by the Michigan Bell Telephone Company (hereinafter referred to as Telephone Company) in Detroit and other areas of the State of Michigan. Substantially all its income was derived from that source. The plaintiff was the sole advertising solicitation agent for the Telephone Company.
The advertisers were required by their contract to pay when billed by the Telephone Company a certain amount per month during the life of a directory. Under the contract, dated May 26, 1917, the Telephone Company was required to pay plaintiff specified commissions monthly, limited to the amounts collected from the advertisers. The amounts paid plaintiff monthly were subject to adjustments every six months. This contract was amended on November 5, 1919, to eliminate the six months’ adjustment provision and to provide that the commissions should be payable monthly on a gross sales basis. Commissions under both arrangements are involved in this case.
When a directory was issued by the Telephone Company it was assigned a projected or estimated life, but frequently the projected life was cut back or extended because of the exigencies of the telephone business. The average projected life for directories was from ten to twelve months, but the Telephone Company had complete control of the length of time a directory would be outstanding and frequently issues were extended or curtailed by one or two months and in some instances for periods of as long as three, four, seven, or nine months. If the projected life of a directory was cut back, an advertising subscriber was not liable for advertising charges beyond the last month the directory was outstanding, and conversely, when the life of a directory was extended under his contract a subscriber was liable for advertising charges for the number of additional months added to the original projected life. Subscribers were thus bound by their contracts to pay advertising charges to the Telephone Company only so long as the directory in which their advertising appeared remained in use and the plaintiff was only *674 entitled to commissions on such, advertising under the same conditions and circumstances.
When a directory was issued plaintiff would compute the amount of one month’s commission thereon and multiply that amount by the number of months in the projected life of the directory. This amount was then reflected in plaintiff’s books as deferred revenue, but no portion of that sum was taken into income through this entry. At the end of the first month in which a new directory was outstanding and at the end of each following month while such directory was outstanding, plaintiff accrued on its books the monthly portion of the commission it was entitled to receive from the Telephone Company and treated this amount as income accruing at the end of the month for which the entry was made. If the projected life of the directory was changed appropriate entries were made.
The plaintiff paid its individual salesmen each month on the basis of the gross value of sales of advertising made by them. At that time it charged the amounts to a deferred expense account. When a directory was issued and the plaintiff became entitled to receive commissions from the Telephone Company for the advertising sold, plaintiff charged against such commissions each month a pro rata part of the salesmen’s commissions which had Been set up as deferred expense at the time the advertising was sold.
The plaintiff treated the commissions as accruing as income for tax purposes at the end of each month for which an applicable directory was outstanding and charged a pro rata part of the applicable salesmen’s commissions against such income. The plaintiff consistently followed this method of reporting its income and expenses from 1981 to the date of its liquidation. This method of accounting clearly reflected plaintiff’s income. Except for the three months’' period ended October 31, 1950, these returns have always been accepted by the Commissioner insofar as the method of accounting was concerned.
Dissension concerning the terms of the contract arose between the plaintiff and the Telephone Company sometime in 1948. Numerous conferences were held and correspondence was exchanged in an effort to effect a satisfactory renewal *675 contract. The negotiations failed and plaintiff’s contract with the Telephone Company expired on October 31, 1950. Termination of the contract resulted in the collapse of plaintiff’s business. For this reason the plaintiff completely liquidated and dissolved on October 31, 1950, and distributed all its assets to its stockholders through duly appointed agents as a liquidating dividend in kind.
On the date of dissolution of plaintiff there remained in its deferred revenue account the sum of $277,565.05 which had not yet accrued as income. This sum represented anticipated commissions on outstanding directories of the Telephone Company to which the plaintiff would have been entitled monthly in. the future had it remained in business and had the directories to which such commissions related remained outstanding through their full projected lives. Prior to its dissolution plaintiff had solicited advertising for inclusion in directories which had not yet been issued by the Telephone Company at the date of dissolution. No amount was reflected on its books with respect to commissions on these directories because under its regular method of accounting a book entry was not made until directories were issued. The monthly payments for the directories outstanding on dissolution and those issued by the Telephone Company after dissolution were made to the agents for the stockholders over a period of approximately 18 months.
The Commissioner included in plaintiff’s income for the short period August 1 to October 31,1950, the entire amount of $277,565.05 reflected in its deferred,, revenue account representing anticipated commissions from the directories then outstanding, and in addition included the amount of $635,-929.51 representing anticipated commissions from directories to be issued in the future. In accordance with plaintiff’s regular method of accounting these sums would not have been accrued as income in less than 18 months had it remained in existence. Deduction for expenses paid in connection with these directories were allowed for the short period.
Deficiencies in income and excess profits taxes were assessed, with interest, by the Commissioner, and paid by *676 plaintiffs. Claims for refund were duly filed, rejected, and this suit was timely instituted.
The plaintiffs contend that the Telephone Directory Advertising Company did not realize the commission income in dispute in this case because such income had not accrued at October 31, 1950; that its accrual method of accounting properly reflected its income for the short period; that in the circumstances the Commissioner lacked authority under the law to change its accounting method, and therefore the taxes were improperly collected.
The defendant contends that this income was properly taxed to the plaintiff because plaintiff earned the income and should not be allowed to escape tax by dissolving and distributing the right to receive that income to the stockholders. The applicable sections of the Code are set forth below.[1]
At the outset the defendant asserts that plaintiff employed a hybrid system of accounting in keeping its books and reporting its income for tax purposes. The plaintiff was on an accrual method of accounting. The plaintiff’s method of accounting more accurately reflects income than does the pure tax accrual method because the income is matched with the expenses incurred in earning it. The only difference between plaintiff’s method of accounting and the pure accrual *677 method as recognized for tax purposes is that plaintiff did not deduct its expenses when “incurred,” but rather deferred them until the income earned from the sales accrued. Insofar as the accrual of the income was concerned, which is the question in dispute here, plaintiff followed the usual accrual of income rule. It accrued the income when it first had an unconditional, fixed and determined right to a reasonably ascertainable amount. See Lucas v. North Texas Lumber Co., 281 U. S. 11; Spring City Foundry Co. v. Commissioner, 292 U. S. 182, and Breeze Corporations, Inc. v. United States, 127 C. Cls. 261, and the cases collected therein.
The plaintiff employed the same consistent accrual accounting method during the short period involved in this case. The findings of the commissioner of this court show that plaintiff’s method of accounting during this short period clearly reflected income for that period. The findings also show that plaintiff did not have a fixed and determined right to receive the anticipated commissions involved in this case on October 31, 1950, the date of its dissolution. The plaintiff under its contract was not entitled to receive the commission on the advertising sold until the end of the month that the advertising appeared outstanding in the telephone directories. The advertisers were not obligated to pay the Telephone Company until that time and the Telephone Company was not obligated to pay plaintiff until that time. Also the amount that it would be entitled to receive could not be determined with reasonable accuracy because of the curtailments and extensions which became necessary in the projected life of the directories due to the exigencies of the telephone business. All the commissions involved in this case accrued and were paid after the dissolution of plaintiff and therefore could not properly be accrued during the short taxable period. See cases collected in Breeze Corporations, Inc. v. United States, supra.
Under the well-settled annual accounting of revenues and expenses concept the Commissioner does not have the authority to allocate income to a taxable year other than the year'in which a fixed right to receive a reasonably ascertainable amount exists. The Supreme Court in discussing the Commissioner’s authority to shift income from one year to *678 another year, stated in Security Flour Mills Co. v. Commissioner, 321 U. S. 281:
* * * But we think it was not intended to upset the well-understood and consistently applied doctrine that cash receipts or matured accounts due on the one hand, and cash payments or accrued definite obligations on the other, should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer. * * * [pp. 285-286]
* * * The uniform result has been denial both to Government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount. * * * [pp. 286-287]
Under neither the cash nor accrual nor any other accepted accounting method could the Commissioner include 21 months of income within a three-month period.
The defendant asserts that although plaintiff’s system of accounting may have accurately reflected income if it had remained in existence, the liquidation with the contractual right to future commissions changed the situation. The Treasury regulation in effect during 1950 specifically provided that no gain or loss is realized by a corporation from the mere distribution of its assets in kind in complete liquidation, with the exception of installment sales. Treasury Regulation 111, sec. 29.22 (a)-20. The language of this regulation was approved by the Supreme Court in United States v. Cumberland Public Service Corp., 338 U. S. 451, and has been codified as section 336 of the 1954 Code. Inasmuch as plaintiff did not have a fixed determined right to receive payment of a reasonably ascertainable amount on October 31, 1950, for the services that it had performed, the contractual right to receive payment upon the genuine condition that the directories remain outstanding represented unrealized income and was an asset distributed to the stockholders. We see nothing in the tax law that requires a corporation, *679 which has employed an accrual method of accounting that properly reflected its income over a period of years, to remain in existence for the sole purpose of paying taxes after it is forced to discontinue business.
The defendant makes a general argument that plaintiff had performed the services and had done everything to earn the commissions and therefore it should be taxed on the commissions. The defendant relies on the assignment of income cases. Lucas v. Earl, 281 U. S. 111; Burnet v. Leininger, 285 U. S. 136; Helvering v. Horst, 311 U. S. 112; Helvering v. Eubank, 311 U. S. 122; Harrison v. Schaffner, 312 U. S. 579; Commissioner v. Sunnen, 333 U. S. 591. The case of United States v. Joliet & Chicago Railroad Co., 315 U. S. 44, may be added to these cases. This same argument was presented to the court in United States v. Horschel, 205 F. 2d 646, and rejected. In the Horschel case the corporation, which was on a cash basis, had liquidated in 1943, and distributed its assets to its stockholders. Some of the assets were sold or collected in 1944 and the Commissioner contended that the income from these assets was already earned by the corporation and had been anticipatorily assigned to the stockholders. The court pointed out that the anticipatory assignment of income cases rests on the proposition that the income was “anticipated, used and realized before it was earned.” The income is taxed to the assignor because he retains the control over the source that earns the income and realizes the income and enjoys the economic benefit by the assignment because it is in satisfaction of his or its wants. If complete control over the source of the income is relinquished, the principle is inapplicable. Blair v. Commissioner, 300 U. S. 5. In the instant case the plaintiff did not have any control over the asset that produced the income after its distribution to the stockholders on October 31,1950. The plaintiff did not realize the income because it was not in existence when it accrued and was paid.
The case of Commissioner v. Henry Hess Co. et al., 210 F. 2d 553, involved substantially the same question that is involved in this case under analogous facts. In the Hess case the Government requisitioned, on November 12, 1942. *680 a vessel owned by the corporation without a determination as to value. On November 18, 1942, the corporation, which was on an accrual basis, dissolved and distributed its claim for the undetermined value of the vessel to its stockholder which, itself, a few days later dissolved and distributed the claim to its stockholders. A dispute ensued as to the value of the vessel which was not settled until in 1944. ' Partial payment was made in 1943 and final payment was made in 1944. The Commissioner sought to tax the profits on the sale to the corporation in 1942,1943 and/or 1944. The court held for the taxpayers stating that the accrual of profits on the sale before liquidation was prevented because of the controversy as to value and that no accrual could be made to the corporation after liquidation because the corporation was not in existence. See also Novo Trading Corp. v. Commissioner, 113 F. 2d 320; Motion Picture Corp. of Calif. v. Commissioner, 1942 P-H BTA-TC memo. Dec., para. 42,110; Lancaster v. Commissioner, 11 T. C. M. 1108. Cf. J. Tingar, Inc. et al. v. Commissioner, 26 T. C. No. 40 (filed May 25, 1956), where the court held, under facts substantially similar to the instant case, that the income was taxable to the corporation because the corporation was still in the process of liquidation.
The defendant’s reliance on the completed contract cases, represented by Jud Plumbing & Heating, Inc. v. Commissioner, 153 F. 2d 681, and Standard Paving Co. v. Commissioner, 190 F. 2d 330, cert. denied, 342 U. S. 860, is misplaced. In those cases the Commissioner properly accrued the income to the corporations that were using the completed contract method, which allows the postponement of accrued income, because it more accurately reflected income. In those cases the accrual was made only to the date of liquidation. In all those cases the right to receive the income was fixed and definite and in some instances the income had already been received.
We conclude for the reasons set out above that the Commissioner improperly included the future commissions in the income of Telephone Directory Advertising Company and that plaintiffs are entitled to recover the resulting taxes and interest.
*681 The facts relating to the second issue are fully set forth in the commissioner’s findings and may be briefly summarized as follows:
When it became apparent that the Telephone Company would not renew its contract a series of meetings was held by the officers and stockholders of plaintiff for the purpose of formulating a plan of dissolution. A plan of dissolution was adopted by the stockholders on September 12, 1950, that contemplated the dissolution of plaintiff on October 31, 1950, and the distribution of all its assets to the stockholders through their agents as of November 1, 1950. The agents for the stockholders negotiated a contract with the Telephone Company in which it was agreed that the agents for the stockholders would sell the materials and records used in selling directory advertising, including compilation records, basic contracts with customers, customer correspondence, contest letters, promotional material and advertising patronage records, etc., and to assign all its leases to the Telephone Company when they were received in liquidation on November 1, 1950, for the sum of $100,000. The assets were transferred pursuant to the contract. The Commissioner included the $100,000 in the income of plaintiff and collected the resulting tax thereon.
The defendant contends that plaintiff was required under the contract dated May 26, 1947, to sell these assets to the Telephone Company for $100,000 and therefore the sale was in reality made by plaintiff. The plaintiff contends that the provisions relating to termination referred to in the May 26, 1947, contract and the sale required under- that contract are not applicable because the contract was not terminated under those provisions, but rather under the May 5, 1949, amendment which provided for automatic expiration on November 30,1950.
The record shows that the sale of these assets was formally and in fact handled completely by the agents for the stockholders. Unless the plaintiff was obligated to sell and the Telephone Company to buy these assets for $100,000 under the May 26,1947, agreement, as amended, the plaintiff comes squarely within the holding of the Supreme Court in United States v. Cumberland Public Service Corporation, supra, *682 where it was held under similar circumstances that a sale made in fact by the stockholders was not taxable to the corporation.
. The pertinent paragraphs of the 1947 agreement are set forth in full in finding 8. Paragraph Twenty-First (relating to period of agreement) provided that the agreement should remain in effect until cancelled by either party with notice of cancellation being given not later than four months prior to the expiration date of the Detroit Classified Directory then in service. Paragraph Twenty-Second (relating to settlement upon termination of agreement) provided that “* * * The Advertising Company agrees to turn over to the Telephone Company its complete compilation records,” etc. Paragraph Twenty-Third (relating to obligations of the parties if agreement terminated by the Telephone Company and Agency Plan simultaneously eliminated) provided that “Upon the termination of this agreement by the Telephone Company, under the provisions of paragraph Twenty-First hereof, and the transfer at that time of the Advertising Company’s operations to the Telephone Company, the Advertising Company will render every assistance possible in effecting a transfer satisfactory to the Telephone Company.” It further provided that upon completion of such a transfer the Telephone Company would pay $100,000 to the Advertising Company. Paragraph Twenty-Fourth (relating to violation and forfeiture) provided that if the contract was cancelled for cause the Telephone Company should nevertheless be obligated “to pay the Advertising Company $100,000 under the conditions outlined in paragraph Twenty-Third” for a satisfactory transfer of its operations to the Telephone Company.
The amendment to this contract made on November 5,1949, provided that the contract as amended should automatically expire November 30, 1950, but that negotiation should be resumed January 16, 1950, for the purpose of concluding a continuing agreement. The contract was actually terminated on October 31, 1950, by mutual consent of the parties because of difficulties with printing schedules.
The record shows that plaintiff’s contract with the Telephone Company was not terminated under paragraph *683 Twenty-Third, but rather under the terms of the amendment to the contract made on November 5, 1949, which provided that the contract should automatically expire on November 30, 1950, unless renewed. Paragraph Twenty-Third was not applicable also because it referred to the payment of $100,000 for the satisfactory transfer of the good will and operating personnel to the Telephone Company and not to the records and leases which were in fact sold. This reflects the interpretation of both parties as indicated by the terms of the contracts, their conduct with respect thereto, including correspondence between the parties and between the Internal Eevenue Service and the Telephone Company. The agents for the stockholders negotiated the sale of the records and leases (which were not referred to in the 1947 contract at all) to the Telephone Company and received payment and a receipt therefor. We conclude, therefore, that the Commissioner improperly included the proceeds from the sale of these assets in the income of plaintiff and that plaintiff is entitled to recover the resulting taxes and interest.
The plaintiff is entitled to recover $493,378.41, with interest as provided by law, and judgment will be entered accordingly.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Richard H. Akers, makes the following findings of fact:
1. The plaintiff, Telephone Directory Advertising Company (hereinafter sometimes referred to as “Advertising Company”), is a corporation organized in 1913 -under the laws of the State of Michigan and having its principal place of business in the City of Detroit in that State. The Advertising Company ceased doing business and was duly liquidated on October 31,1950. However, under the laws of the State of Michigan, its corporate identity was preserved *684 for purposes of this proceeding. The plaintiffs, C. Harry Chisholm, Charles F. Welsh, and Eose J. Mertz, constituted a majority of the board of directors of the Advertising Company at the time of its liquidation and dissolution, and, prior to October 31,.1950, were elected by the board of directors as liquidating trustees of that company. Unless otherwise indicated, the term “plaintiff” is used herein as referring to the Advertising Company.
2. Within the time required by law, there was duly filed on behalf of the plaintiff its corporation income tax return, including “Schedule EP (Form 1120) ”, for the three month taxable period August 1, 1950, to October 31, 1950, showing no liability for either income or excess profits taxes for that period. Subsequently, the Commissioner of Internal Eeve-nue (hereinafter referred to as the “Commissioner”) made a final determination that the plaintiff was liable for income taxes in the amount of $332,407.28 and for excess profits taxes in the amount of $104,210.78 for the aforesaid taxable period. The tax liability so determined by the Commissioner was fully satisfied by payment on May 15, 1953.
3. On June 8, 1953, and within the time required by law, the plaintiff duly filed claims for refund of income, and excess profits taxes for the period August 1, 1950, to October 31, 1950, in the respective amounts of $332,407.28 and $104,210.78 plus deficiency interest paid on each amount and for such further amounts as might be legally refundable. The grounds for the refunds as stated in the claims were that the Commissioner (1) had erroneously included in the plaintiff’s taxable income for the three month period August 1,1950, to ■ October 31,1950, an amount of $691,693.70, no part of which had been received by or was accruable by the plaintiff during that period; and (2) had erroneously determined that certain assets were sold by the plaintiff to the Michigan Bell Telephone Company at a profit of $100,000 when, in fact, such assets had been distributed as a liquidating dividend in kind to the then stockholders of the plaintiff and were sold to the Telephone Company by such stockholders. .
4. The Commissioner by registered letters dated September 11, 1953, rejected the aforesaid claims for refund.
*685 5. The plaintiff, from its inception in 1913 until its liquidation on October 31,1950, was engaged in the business of selling and scheduling advertising for publication in telephone directories to be issued by the Michigan Bell Telephone Company (hereinafter sometimes referred to as the “Telephone Company”) in Detroit and other areas of the State of Michigan, and substantially all of its income was derived from that source. The plaintiff compiled the classified directories for the Telephone Company and was the sole advertising solicitation agent for the Telephone Company in the area served by it. The plaintiff filed its corporation tax returns on the basis of fiscal years ended July 31, and filed its final corporation tax return for the taxable period beginning August 1, 1950, and ending October 31, 1950. It kept its books and records on an accrual method of accounting which is hereinafter more fully described in findings 33, 34, and 35, with respect to the two major items in controversy.
6. On May 26, 1947, the plaintiff entered into a renewal contract with the Telephone Company under the terms of which the Telephone Company granted to the plaintiff the exclusive right (with exceptions not here material) to sell and schedule advertising in its telephone directories. The Telephone Company reserved the right, inter alia, to determine the kind, style and frequency of issuance of the directories, to exclude objectionable advertising, to bill monthly on regular telephone bills all directory advertising charges from advertising billing orders prepared by the plaintiff and forwarded to the Telephone Company, to approve credit for any prospective advertiser, and to charge off any account which it was unable to collect, but the plaintiff was given the right to make further collection efforts which, if successful, inured to the benefit of the Telephone Company which would thereafter pay the plaintiff its appropriate commissions. Under the further terms of the contract, the plaintiff agreed to expend the necessary efforts to develop the telephone directory advertising business in order to produce the desired annual revenue, subject, however, to the right of the Telephone Company to formulate the objectives to be attained and to suggest methods of attaining such objectives. *686 Under the contract the plaintiff had the general responsibility for preparing the advertising for inclusion in the telephone directories including art work, cuts and plates, and also was granted the right to insert in the directories such “fillers” as might seem desirable for the purpose of promoting the sale of directory advertising and/or stimulating classified directory usage.
7. Under the contract referred to in the preceding finding, on all directory advertising sold by the plaintiff and accepted by the Telephone Company, the latter agreed to pay to the plaintiff commissions in accordance with a formula specified in the contract, limited, however, to collected revenue. Under such formula the Telephone Company agreed to pay the plaintiff “as a commission, 20% of the collected revenue for the advertising sold by the Advertising Company [plaintiff] in all outstate directories”, and “a commission at the rate of 16.5% of the gross annual revenue value of advertising sold in the Detroit directory” with certain qualifications which would reduce that percentage when certain maximum amounts of advertising were attained. Such commissions were required to be paid monthly and on or before the tenth day of the month following the month of billing by the Telephone Company to the subscriber. However, amounts so paid were subject to adjustment every six months according to a statement prepared by the Telephone Company showing “charge-offs for adjusted advertising charges, uncollectible items, stoppage of billing due to discontinuance of telephone service, adjustments for errors, etc.”, and the Telephone Company billed the plaintiff for overpayments due to such causes. By an amendment of November 5,1949, the requirement that the commissions payable to the plaintiff should be adjusted by reason of uncol-lectible accounts was eliminated and provision made that the commissions should be payable on a gross sales basis, whether or not the advertisers paid in full for the period during which their advertising appeared in directories which were outstanding and in use. At all times the plaintiff paid its solicitors each month on the basis of advertising sold without regard to collections.
*687 8. The contract of May 26,1947, between the plaintiff and the Telephone Company (referred to in findings 6 and 7) provided further in part as follows:
PERIOD OP AGREEMENT
Twenty-pirst : This agreement shall take effect with outstate directories scheduled for publication during the month of June 1947, the November 1947 Detroit alphabetical directory and the February 1948 Detroit Classified Directory. Except as provided for, in paragraph Twenty-Fourth hereof, this agreement shall continue in effect for an initial period of two issues of the Detroit Classified Directory, beginning with the February 1948 issue and shall cover all outstate directories to be published in the same period, and thereafter unless or until cancelled by either party as hereinafter provided. Notice of cancellation by either party under this section Twenty-First shall be given to the other party not later than four months prior to the expiration date of the Detroit Classified Directory then ix service. Such cancellation shall be effective at the end of the solicitation period of the Detroit Classified Directory then in progress, and shall apply at that time to all Michigan Directories which were scheduled for publication after that date. The final commission payment due for each directory shall be for the advertising billed for the last month of the last issue of such directory for which solicitation was made by the Advertising Company prior to the effective date of such cancellation.
SETTLEMENT UPON TERMINATION OP AGREEMENT
Twenty-second: Upon termination of this agreement for any cause whatsoever, the Telephone Company shall withhold the commission payments for the last two months of the final issue of each and every directory for which the Advertising Company was the sole selling agent, until 90 days after the expiration of such final issue. * * * The Advertising Company agrees to turn over to the Telephone Company its complete compilation records, credit records, patronage records, billing order records, card record of business subscribers and additional listings, prospect records, advertising schedules, contracts with advertisers, and such other records as the Telephone Company may deem necessary to collect outstanding accounts, to fulfill existing contracts with *688 advertisers and/or to continue the sale of advertising for future issues of all directories, immediately after the solicitation period for the final issue for which it was the selling agent. The Telephone Company agrees that, in the case of existing uncompleted contracts with advertisers which are assigned to it by the Advertising Company under the foregoing provision, it will assume the obligations of the Advertising Company under such contracts, and will assume all liabilities which may thereafter accrue under such contracts and will save the Advertising Company harmless from any such liability thereafter accruing. The Advertising Company further agrees that in the event of cancellation arising from any cause, it will not use the name “Telephone Directory Advertising Company”, or any name which the Telephone Company considers as similar to the name “Telephone Directory Advertising Company,” in Michigan, except for liquidation purposes, and that it will not dispose of that name without written consent of the Telephone Company.
OBLIGATIONS OE THE PARTIES IE AGREEMENT TERMINATED BY THE TELEPHONE COMPANY AND AGENCY PLAN SIMULTANEOUSLY ELIMINATED
Twenty-ti-iird : Upon the termination of this agreement by the Telephone Company, under the provisions of paragraph Twenty-First hereof, and the transfer at that time of the Advertising Company’s operations to the Telephone Company, the Advertising Company will render every assistance possible in effecting a transfer satisfactory to the Telephone Company. A satisfactory transfer shall include such matters as the following: the making of every reasonable effort to transfer to the Telephone Company the goodwill the Advertising Company has built up over the years of its existence, so that its employees, customers and the public will retain their respect for the Telephone Company and the Advertising Company; and, for a period of not over four months prior to the date of termination, the Advertising Company shall, upon written request from the Telephone Company, render every possible assistance in acquainting, training and advising certain Telephone Company personnel as to its records, organization, techniques and methods, such assistance being based upon its many years of experience in the business. * * *
For the completion of a satisfactory transfer as above set forth, the Telephone Company agrees to pay the *689 Advertising Company one hundred thousand dollars ($100,000.00). Should the parties hereto disagree as to whether or not performance has been satisfactory, it is agreed that the final decision on that question shall lie with Ben B. Marsh, at present the Vice-President and General Manager of the Telephone Company, or, if he is unable to perform this duty, with W. E. Shane, at present the General Commercial Manager of the Telephone Company, or, if neither of them is able to perform, then with one person whom the Advertising Company may choose from the three persons who then occupy the offices of President, Vice-President and General Manager, and General Commercial Manager of the Telephone Company; and the parties hereto agree to accept and be bound by the decision so made. The said $100,000 shall be paid six months after the termination of this contract and the elimination of the agency plan of selling.
The Advertising Company further agrees that, upon the elimination of the agency plan as herein set forth, it will sell to the Telephone Company and the Telephone Company will buy all of its office machinery, furniture, equipment and supplies used in the business. The Advertising Company shall retain only the furniture and furnishings in the private offices of Mr. Cohn and Mr. Chisholm and the reception room, and such records, supplies, furniture, and equipment as shall be necessary to maintain its own private set of books. * * *
VIOLATION AND EOREETTORE
Twenty-fourth: All terms and conditions named herein are binding upon both parties and the failure of either party to comply with the terms and conditions of this agreement shall be sufficient cause for the cancellation of the entire agreement; provided, however, that in the event of any violation, the aggrieved party shall give the other party notice in writing of such violation, and if such violation is continued without remedy for a period of ten (10) days after such notice, this agreement may be terminated immediately at the option of the aggrieved party, but nothing in this agreement shall be understood to affect the remedy either party may have in the recovery of damages either in law or equity, because of such violation. Cancellation for cause as above provided, by the Advertising Company, shall not relieve the Telephone Company of its obligation to pay the Advertising Company $100,000 under the conditions *690 outlined in paragraph. Twenty-Third hereof, for a satisfactory transfer of its operations to the Telephone Company, which transfer shall be completed within forty-five (45) days. In the event of cancellation of this agreement, between issues of any directory, it is understood and agreed that the Advertising Company shall receive the commissions provided for herein, only on such advertising as was sold by it and subsequently published.
9. Prior to November 3, 1948, some dissension arose between the plaintiff and the Telephone Company concerning the terms of the contract then in effect and on November 8, 1948, the plaintiff addressed a lengthy letter to the Telephone Company detailing the changes it would desire in any future contract. Under date of July 27,1949, the plaintiff addressed a further letter to the Telephone Company reading as follows:
This Company’s agreement with your Company, dated May 26, 1947, covering the sale of advertising in the Detroit and State telephone directories, provides that notice of cancellation of that agreement shall be given by one party to the other four months prior to the expiration date of the issue of the Detroit directory then in service. In accordance with that provision, you are hereby given notice of such cancellation effective December 1,1949.
Before we begin the canvass on the Detroit directory scheduled to start December 1,1949, a new contract must be made between our two companies which corrects the points outlined in our letter of November 3, 1948, addressed to Mr. Ames.
We are, of course, entirely willing to continue cooperating in an effort to arrive at a working agreement acceptable to both parties, and regret having to take this action. However, we have no alternative, as the Telephone Directory Advertising Company must not be committed to another Detroit directory period under the terms and conditions of the present contract.
On July 29, 1949, the Telephone Company responded to the above letter as follows:
This will acknowledge receipt of your letter dated July 27, 1949 in which you gave us the four months’ notice of intent to cancel your contract as provided in the contract.
*691 I regret sincerely that we have not been able to work ont our differences and you have felt it necessary to cancel the contract. Since you indicated in the cancellation notice your willingness to write a new contract, we will be happy to enter into negotiations with you promptly in that respect, and I have asked Mr. Shane to have Mr. Nulling and Mr. Ames sit down with you immediately for that purpose.
10. After several conferences between representatives of both companies, the plaintiff and the Telephone Company executed an agreement dated November 5, 1949, whereby the contract of May 26,1947, was amended in certain details and the notice of cancellation dated July 27,1949, was withdrawn. With respect to commissions to be paid the plaintiff for soliciting advertising, the percentages were changed and provision made that the plaintiff’s profit therefrom should not exceed $125,000 after taxes and be not less than $75,000 after taxes. It was further provided that all such commissions were to be paid on a gross sales basis, that the plaintiff was to be paid “for its compilation job separately on a cost plus 5% service fee basis”, and that if, after the plaintiff had had enough time, in the opinion of the Telephone Company, to revamp its compilation job to produce satisfactory results and the results were not then satisfactory, the Telephone Company would take over that job upon giving three months’ notice of its intention to do so. The amendment also provided that the contract as amended should expire automatically November 30, 1950, but that negotiations should be resumed January 16, 1950, “for the purpose of concluding a continuing agreement on or before July 15,1950”.
11. On November 25,1949, C. H. Chisholm of the plaintiff addressed a letter to the Telephone Company in which he suggested certain provisions for inclusion in any future contract. On December 9, 1949, the Telephone Company responded to the aforesaid letter, stating in substance that the suggestions made would be accorded fullest consideration when negotiations for a new contract were resumed in January 1950. The letter, however, expressed some dissatisfaction with errors and inaccuracies which had appeared in prior directories.
*692 12. On August 2,1950, the Telephone Company addressed a letter to the plaintiff reading as follows:
We are sorry that our negotiations have not resulted in a new contract with your Company. As you know, August 1,1950, was the extended date for the conclusion of such an agreement, which would have stopped the automatic termination of the contract on November 30, 1950.
That being the situation it is desirable to discuss certain matters in connection with the termination of the contract. You will, of course, complete the sales canvass for the November 1950 Detroit Yellow Pages Directory, and complete the compilation jobs and prepare for the printer the material necessary so that the advertising you have sold will be published before that date. However, we would like to get your views as to whether you will continue to sell to the end, and also complete the operations that are necessary to publish the Bold Type Listings you sold for the March 1951 Detroit Alphabetical Directory which, as you know, will not be published until after the date of termination of the contract. Also, a relative situation is the question as to how far in the schedule of books you propose to complete the sales work and other operations necessary to publish such advertising you sold for inclusion in the Outstate books.
We also wish to discuss the transfer of records so that work interruption can be avoided and also, to arrange for the completion of our obligation to purchase your office machinery, furniture, fixtures, equipment and supplies.
To allow for the continuation of your operations and the satisfactory conclusion of your services by November 30, 1950, you will need your personnel. However, we would like to discuss the possibility of your personnel becoming employees of this Company and continuing their respective duties as members of our organization.
We will also be happy to discuss the possibility of taking over the leases you now hold or any other matters relating to the consummation of relationship.
13. On August 22, 1950, the plaintiff addressed a letter to the Telephone Company making certain proposals with respect to a new contract to be based on single issues of the various directories, with the plaintiff to be paid a 25 percent flat commission on gross charges for its advertising sold, and its compilation work to be compensated for as under the *693 existing contract. By letter dated August 28,1950, the Telephone Company replied as follows:
I have reviewed your letter of August 22, and the proposals you made are not significantly different from what we talked about when I was in your office with Mr. Nulling and Mr. Ames on August 18.
The full risk proposal, with a commission of 25%, would restore your profits at levels even exceeding those to which we have had obj ection in the past.
Your proposal in connection with a cost plus contract still included no recognition that we should be in a position to cancel the contract in the event of your failure to perform satisfactorily in connection with the initial issue to be handled by you under the contract. We have objected to that, as you know, all along.
I do not believe there is anything more to be gained by our continuing our discussions, and since the time available to us for preparing to take over your operations is fast running out, I believe we should proceed with our plans as outlined in Mr. Kulling’s letter of August 2.
14. On August 29,1950, the annual meeting of the class A stockholders (voting stock) of the plaintiff was held and the incumbent directors were reelected. Thereafter Charles H. Chisholm, the executive vice president of the plaintiff, reported to the stockholders that little progress had been made in negotiating a new contract with the Telephone Company and that while the plaintiff had submitted two offers to the Telephone Company no decision had been reached. The stockholders then again referred the matter of negotiating a new contract to the board of directors with full power to act.
Immediately following the adjournment of the foregoing stockholders’ meeting, the newly reelected board of directors held its annual meeting at which officers for the ensuing year were elected and certain routine business was transacted.
15. On August 30,1950, the Telephone Company addressed the following letter to the plaintiff:
As indicated in Mr. Kulling’s letter of August 2, it is our intention to accept the termination of our contract with the Telephone Directory Advertising Company under the terms of the Memorandum Agreement in effect.
I would like to meet with you not later than Septem *694 ber 5 to discuss the terms of the transfer of operations so that both your interests and ours will be protected.
16. On August 31,1950, a special meeting of the plaintiff’s board of directors was called at which C. Harry Chisholm, executive vice president and general manager, reported to the board that he had been unsuccessful in his attempts to negotiate a renewal of the contract with the Telephone Company on any satisfactory basis and referred to the letters from that company dated August 2, 1950, August 20 [28], 1950, and August 30, 1950, which he stated referred to the Telephone Company’s desire to terminate the contract, and to confer with the plaintiff with respect to the procedure to be followed in connection with the transfer of the business to the Telephone Company. After a full discussion of the matter by the Board it was unanimously agreed that it was not to the best interests of the plaintiff to sell or negotiate with respect to the sale of any of its assets. However, Mr. Chisholm stated that he had been advised by co-counsel that under the contract the Telephone Company had the right to purchase the office furniture and equipment, and that the corporation should negotiate with the Telephone Company with respect to the sale of the office furniture, equipment and supplies solely. After further discussion it was recognized by the board that the cancellation of the contract by the Telephone Company deprived the corporation of any purpose for the continuance of its corporate entity in view of the fact that it had no other business and must, under the terms of the contract, terminate the use of its corporate name. Upon completion of the discussion the following resolutions were unanimously adopted by the board:
Resolved, That C. Harry Chisholm, Executive Vice President and General Manager, be authorized to negotiate with the Michigan Bell Telephone Company with respect to the sale solely of the office furniture, equipment and supplies, and that he is to have no authority to negotiate or sell any other asset, tangible or intangible.
Resolved, That in the judgment of this Board of Directors it is deemed advisable and for the benefit of the Telephone Directory Advertising Company that said corporation should be dissolved; and to that end, as required by law, it is ordered that a meeting of the stock *695 holders of said corporation, including all Class A and Class B stockholders, said Class A stockholders having sole voting power, to take action upon this resolution, be and hereby is called, to be held at 310 Lafayette Building, in the City of Detroit, County of Wayne, State of Michigan, on the 12th day of September, 1950 at 2:00 o’clock in the afternoon, and that the Secretary of this corporation be and she hereby is authorized and directed to cause notice of the adoption of this resolution and of such meeting, to be mailed to each stockholder of this corporation immediately after the adoption of this resolution, and that on or before September 12, a detailed plan of liquidation be submitted to the stockholders or at such meeting.
17. On August 31, 1950, pursuant to the direction by the board of directors of the plaintiff in the resolution set out in finding 16, the secretary of the plaintiff issued to the stockholders thereof a notice of a special meeting to be held on September 12,1950, for the following purposes:
1. To consider and take action upon and with reference to a resolution adopted by the Board of Directors of the company on the 31st day of August, 1950, declaring it to be advisable and most for the benefit of the corporation to dissolve and to distribute its assets among its stockholders.
2. To consider and take action upon such other and further matters as may properly come before said meeting.
18. On September 1, 1950, a special meeting of the stockholders of the plaintiff was held at which C. Harry Chisholm explained that the meeting had been called at his suggestion to outline a plan to be discussed. He reviewed his negotiations with the Telephone Company with reference to the renewal of the contract between the two corporations and informed the meeting that he had made every possible effort to negotiate a new contract on terms which would be satisfactory but that he had been unsuccessful. He also stated that the Telephone Company contended that the contract would terminate on November 1, 1950, instead of December 1, 1950, but that there was a controversy between the parties as to that contention. He further stated that he had endeavored, for and in behalf of the stockholders, to sell to the *696 Telephone Company all of the outstanding stock of the plaintiff at a price to be determined but that he had been unsuccessful. He further advised that he had been authorized by the board of directors to negotiate with the Telephone Company for the sale by the plaintiff of its office furniture, equipment and supplies only and was so negotiating, it being his understanding that the contract required the plaintiff to offer to sell such assets first to the Telephone Company. Mr. Chisholm also explained to the stockholders a method which he considered would be expedient in the event of the dissolution and liquidation of the corporation and advised the stockholders to appoint agents to act for and in behalf of all stockholders, with full authority to bargain, sell and assign all assets received by the stockholders, if, as and when same were received in liquidation, such agents to be further authorized to pay any and all outstanding liabilities of the corporation owing at the time of its dissolution, and to be authorized to execute assignments of leases, and to negotiate for the sale of any asset received in kind from the corporation in the liquidation, and to negotiate and settle any and all claims for or in behalf of the stockholders, and with further authority to collect from the Telephone Company all amounts when due from it and from any and all other debtors, and with full authority to disburse to the stockholders pro rata, any and all receipts which might come into their hands, until all of the assets formerly belonging to the plaintiff had been entirely liquidated. Thereupon the following resolution was unanimously adopted by the stockholders:
Kesolved: That C. Harry Chisholm, Edward E. Grimes and Max Smitt be and they hereby are appointed and designated as agents for all of the stockholders, with full power and authority, in the event of the dissolution and liquidation of the Telephone Directory Advertising Company, to bargain, sell and assign all assets received by the stockholders, for and in their behalf, if, as and when same are received in liquidation; said agents are further authorized to pay any outstanding liabilities of the corporation owing at the time of its dissolution, and are authorized to execute Assignments of Leases, and to negotiate for the sale of any asset received in kind from the corporation in said liquidation, and to sell the same, and are authorized to execute bills *697 of sale therefor; and to negotiate and settle any and all claims for or in behalf of the stockholders, and are further authorized to collect from the Michigan Bell Telephone Company all amounts when due from it and from any and all other debtors, and are directed to disburse to the stockholders, after payment of all said claims, any and all receipts which may come into their hands, until all of the assets formerly belonging to the said company have been entirely liquidated.
It is further Resolved : That the agents of the stockholders shall from time to time make distribution of the receipts and proceeds of the liquidation and assets to the stockholders pro rata, according to their stockhold-ings, share and share alike, after the payment of the liabilities as hereinbefore provided for, and. after providing sufficient reserve to take care of any contingent liabilities.
Be it further Resolved : That the agents of the stockholders shall render such services gratis, but all necessary expenses incurred in the performance of their duties, ordinary and extraordinary, shall be paid from the moneys received in liquidation for and on behalf of the stockholders.
It is further Resolved: That if one of the agents herein appointed be unable to serve as such, or should he resign, the two (2) remaining agents shall have full authority and power to act as such, but in the event that two (2) of said agents should fail to qualify or be unable to act, the stockholders reserve the right in such event to appoint other agents to act as such, for and in behalf of said stockholders.
It is further Resolved : That the said agents, C. Harry Chisholm, Edward R. Grimes and Max Smitt shall designate in writing their acceptance of the obligations and duties to be by them performed in behalf of the said stockholders and they shall be required to open a commercial bank account in the National Bank of Detroit, Main Office, and the said depository shall be directed to honor checks on said account signed by the said C. Harry Chisholm and countersigned by either Edward R. Grimes or Max Smitt as agents, and a certified copy of this portion of the resolution shall be delivered to the said National Bank of Detroit, if requested.
It was the unanimous sense of the meeting that the above resolutions be affirmed at the special meeting of the stockholders to be held thereafter on September 12, 1950.
*698 19. On September 1,1950, C. Harry Chisholm, Edward R. Grimes and Max Smitt, who had been appointed and designated as agents for the stockholders by the resolution adopted by such stockholders at the special meeting held on September 1, 1950, as aforesaid, executed an instrument in which they formally accepted the appointment and designation and agreed to faithfully perform all duties and functions incident to such appointment. Subsequently Max Smitt resigned as such agent but C. Harry Chisholm and Edward R. Grimes have continued in their respective capacities and are now the surviving agents.
20. On September 8, 1950, an adjourned meeting of the board of directors of the plaintiff was held, the minutes of which show the following:
Mr. Chisholm reported progress having been made in his negotiations with the Michigan Bell Telephone Company with reference to the salé of the office furniture, equipment and supplies, but that no final conclusion has as yet been reached. He also reported that he received correspondence from the Michigan Bell Telephone Company, which definitely has resulted in it refusing to negotiate further for a new contract with this company under any terms or conditions, and that it now becomes necessary for the corporation to fulfill the balance of the present contract and terminate and liquidate, in accordance with the program as outlined in the minutes of the special meeting of the Board held on the 81st day of August 1950.
A full and complete discussion was had by those present and the plan to be presented to the stockholders, at the meeting called for the 12th day of September 1950, was outlined, same to be presented as follows:
1. It is to be recommended by the Board to the stockholders that the corporation be dissolved as of the close of business October 31, 1950.
2. That all of the assets of the corporation, both tangible and intangible, be assigned to the stockholders on November 1, 1950, as a liquidating dividend in kind.
3. That the stockholders shall assume the payment of all liabilities due and owing and unpaid by the corporation at the close of business October 31st, 1950, solely out of the assets assigned to them as a liquidating dividend in kind.
4. That C. Harry Chisholm be and is hereby appointed custodian of the books and records of this corporation, *699 to be held and preserved by him in accordance with the requirements of law.
5. That provision to the extent of $25.00 per year for the period of ten years be made for the storage and preservation of said records.
6. That the Directors, at their last meeting to be held on October 25, 1950, authorize Mr. Chisholm to pay certain of the employees termination pay, the amount of which shall be determined by said Board at said meeting.
21. On September 12,1950, the plaintiff’s stockholders held a special meeting for a consideration of the plan outlined at the meeting of September 8, 1950, and set out in finding 20. At this' special meeting the following resolutions were adopted:
Resolved, That the Telephone Directory Advertising Company surrender its charter to the State of Michigan and that it cease to be and exist as a corporation at the close of business on October 31st, 1950, and further
Resolved, That Charles F. Welsh, Vice President, and Rose J. Mertz, Secretary of the said Telephone Directory Advertising Company, be and they hereby are authorized and directed to file the necessary certificate of dissolution of this corporation with the Michigan Corporation and Securities Commission and to file the necessary certificates with the Department of Revenue to obtain the necessary releases, and to file all necessary forms, including final Tax Returns, with the United States Internal Revenue Department, and to pay all necessary fees, costs, and any and all taxes and expenses relative to the filing of said necessary forms, and all other expenses, including auditing and legal fees in connection therewith and the said officers and Board of Directors are hereby authorized, empowered and directed to do all things necessary and requisite to carry into effect the foregoing resolutions.
The chairman then read the resolution passed at a special meeting of the stockholders held on September 1, 1950, appointing C. Harry Chisholm, Edward R. Grimes and Max Smitt agents for the stockholders and outlining their duties as such. Whereupon the stockholders adopted a resolution identical in words and figures with that adopted at the meeting of September 1,1950, which is set out in full in finding 18.
Thereafter a discussion was had with respect to the *700 method to be followed in liquidating the corporation and the following resolution was adopted:
Be it Besolved, That on November 1, 1950, all of the assets of the Telephone Directory Advertising Company, both tangible and intangible, shall be assigned to C. Harry Chisholm, Edward K. Grimes, and Max Smitt, duly authorized agents for all of the stockholders of said corporation.
The chairman then advised the meeting that the officers believed it advisable to recompense certain of the employees for their loyal service in the form of termination pay and the following resolution was unanimously adopted:
Be it Besolved, That the officers, prior to or on October 31, 1950, pay to certain employees termination pay, in accordance with a plan to be worked out by said officers, same to be based upon length of service with the company, and they are to expend for said termination pay a sum not to exceed the sum of $96,000.
The stockholders further adopted the following resolutions :
Besolved, That the Board of Directors act as liquidating Trustees for the said corporation in the dissolution thereof and C. Harry Chisholm shall have charge of the preservation of the books and records of the corporation as required by law.
Besolved, That the stockholders approve the action of the Board of Directors in negotiating for the sale of office furniture, equipment and supplies to the Michigan Bell Telephone Company.
22. Immediately following the special meeting of the stockholders referred to in finding 21, the board of directors of the plaintiff held a meeting at which the chairman reported the action taken by the stockholders. Thereupon the board of directors, as liquidating trustees, was authorized to assign to C. Harry Chisholm, Edward B. Grimes, and Max Smitt, as agents for the stockholders, on the assignment and delivery of the shares of stock held by such stockholders, and in full redemption of that stock, all of the assets, both tangible and intangible, belonging to the corporation at the close of business October 31,1950.
*701 The board further adopted the following resolution:
It was Resolved, by the vote of all, That in accordance with Section 74A of the Michigan Corporation Code that C. H. Chisholm, Charles F. Welsh, and Rose J. Mertz, three of the Directors of the Corporation, be and are hereby constituted Liquidating Trustees for the Telephone Directory Advertising Company, their power as such to begin at the close of business of the corporation October 31, 1950.
23. On October 5, 1950, C. Harry Chisholm, Edward R. Grimes, and Max Smitt, as agents for the stockholders of the plaintiff, entered into an agreement with the Telephone Company reading as follows:
Memorandum of Agreement made and entered into this 5th day of October, A. D. 1950, by and between the undersigned C. Harry Chisholm, Edward R. Grimes, and Max Smitt, duly authorized agents for all of the stockholders of the Telephone Directory Advertising Company, a Michigan corporation, with its principal offices in the City of Detroit, County of Wayne, State of Michigan, hereinafter designated as “Vendors,” and the Michigan Bell Telephone Company, a Michigan corporation, hereinafter designated as “Vendee.”
WITNESSETH, that
Whereas the Vendors expect to acquire certain of the assets of the Telephone Directory Advertising Company, a Michigan corporation, more particularly hereinafter described, and in the event of such acquisition desire to sell to the Vendee, and the Vendee is desirous of purchasing same, said assets being described as follows:
1. All material and records used in selling directory advertising, compiling directories and supplying information for the billing of customers. It is intended to include therein all material completed, and in process, required for publishing directories scheduled for publication after October 31st, 1950; basic contracts carrying customers’ signatures; all customer correspondence, including contest letter’s and testimonial letters from customers; customer claim files and correspondence and associated records; all records in the Order Entry Department; permission to use or copy basic payroll and personnel records; all cuts, copies of the cut manual and copies of the salesmen’s manuals; all brief cases; art work completed and in progress; promotional material *702 completed and in progress; advertising patronage records and no patronage records.
It is the intent of the foregoing to transfer all records, now used by the Telephone Directory Advertising Company in its business excepting only the Telephone Directory Advertising Company’s own private set of books and payroll and personnel records, and expected to be acquired by the Vendors as aforesaid.
2. Assignment of all Leases now owned by the Telephone Directory Advertising Company, and to be assigned to the Vendors, covering quarters used by the said Telephone Directory Advertising Company in the Cities of Detroit, Grand Kapids and Flint, Michigan, it being agreed that the Vendors will secure the necessary fiermission of the Lessors for the assignment of said ceases, and the Vendee herein agrees to execute the necessary consent to assume the obligations of the Lessee in said Leases.
The said above described assets are to be transferred, assigned and delivered to the Vendee immediately upon their being acquired by the Vendors from the said Telephone Directory Advertising Company, and the Vendee agrees to purchase the said above described assets and assume Lessee’s obligations in said Leases.
Now, Therefore, for and in consideration of the mutual agreements herein contained, the parties hereto covenant, promise and agree as follows:
(a)Vendors shall grant, bargain, sell, release, transfer and deliver to the Vendee the property hereinabove described, same to be free and clear of liens and incum-brances of every kind and nature whatsoever.
(b)In consideration of such sale, conveyance, transfer and delivery to the Vendee, the said Vendee agrees to purchase said hereinabove described property and to assume Lessee’s obligations in said Leases and to pay to the undersigned duly authorized agents of said stockholders the sum of One Hundred Thousand ($100,000) Dollars on or before fifteen (15) days after the transfer of said assets.
(c)Acquisition of said assets is contemplated by the Vendors at the close of business October Slst, 1950, and possession of said quarters under Lease, together with all of the assets, shall be given to the Vendee at the beginning of business on the 1st day of November, 1950.
24. On October 5, 1950, the plaintiff, through its appropriate officers, executed a formal bill of sale whereunder it sold to the Telephone Company all of its furniture, fixtures, *703 and supplies (with immaterial exceptions) located in its offices at Detroit, Grand Rapids, and Flint, Michigan. A complete list of the goods and chattels so sold was attached to the bill of sale. The selling price of these assets was $46,708.80 and the net profit realized by the plaintiff from the aforesaid sale was $14,453.98 which amount was reported as income in the plaintiff’s final return, such return being for the period August 1 to October 31,1950, inclusive. As shown in findings 25 and 26, certain tangible and intangible assets of the plaintiff were turned over to the liquidating trustees of the plaintiff at the date of dissolution who in turn distributed them to the stockholders as a liquidating dividend in kind and subsequently on the same day, but in accordance with the agreement of October 5, 1950, set out in finding 23, they were sold by the agents for the stockholders to the Telephone Company for the sum of $100,000.
25. On November 1, 1950, C. Harry Chisholm, Charles F. Welsh and Rose J. Mertz, liquidating trustees for the plaintiff, addressed the following letter to the Telephone Company:
This is to inform you that, pursuant to resolutions adopted by the stockholders of the Telephone Directory Advertising Company September 12th, 1950 and incident to the dissolution of the Telephone Directory Advertising Company, all of the assets of that company, both tangible and intangible, were assigned as of this date as a liquidating dividend in kind to C. Harry Chisholm, Edward R. Grimes and Max Smitt as duly constituted agents for all of the stockholders of the company, arrangements having first been made for payment of all debts and liabilities of the company.
The assets so distributed included all brief cases, and all materials and records iised in selling directory advertising, compiling directories and supplying information for the billing of customers. These materials and records included all material completed, and in process, required for publishing directories scheduled for publication after October 31st, 1950; basic contracts carrying customers’ signatures; all customer correspondence, including contest letters and testimonial letters from customers; customer claim files and correspondence and associated records; all records in the Order Entry Department; all cuts, copies of the cut manual and copies of the salesmen’s manuals; art work completed and in *704 progress; promotional material completed and in progress ; and advertising patronage records and no patronage records.
26. On November 1, 1950, C. Harry Chisholm, Edward R. Grimes and Max Smitt, agents for the stockholders of the plaintiff, executed a bill of sale to the Telephone Company reading as follows:
Know All Men by These Presents, That C. Harry Chisholm, Edward R. Grimes and Max Smitt, agents for the stockholders of the Telephone Directory Advertising Company, of the City of Detroit in the County of Wayne and State of Michigan, parties of the first part, for and in consideration of the sum of One ($1.00) Dollar and other good and valuable considerations to them paid by Michigan Bell Telephone Company, a Michigan corporation, party of the second part, the receipt whereof is hereby acknowledged, have bargained and sold, and by these presents do grant and convey, unto the said party of the second part, its executors, administrators or assigns, all the following goods and chattels, to wit: all brief cases, and all materials and records used in selling directory advertising, compiling directories and supplying information for the billing of customers. These materials and records include all material completed, and in process, required for publishing directories scheduled for publication after October 31st, 1950; basic contracts carrying customers’ signatures; all customer correspondence, including contest letters and testimonial letters from customers; customer claim files and correspondence and associated records; all records in the Order Entry Department; all cuts, copies of the cut manual and copies of the salesmen’s manuals; art work completed and in progress; promotional material completed and in progress; and advertising patronage records and no patronage records, which said above-described goods and chattels belong to the above named, and are now in their possession at 321 West Lafayette Boulevard, Detroit 26,- Michigan, To Have and to Hold the same unto the said party of the second part, its executors, administrators and assigns, Eorever. And the said parties of the first part, for their heirs, executors and administrators, do covenant and agree to and with the said parties of the second part, its executors, administrators and assigns, to Warrant’and Defend the sale hereby made of said property, goods and chattels, unto the said parties of the second *705 part, its executors, administrators and assigns, against all and every person or persons whatsoever.
The actual selling price paid by the Telephone Company to the agents for the stockholders for the above-described assets was $100,000, as set out in the agreement of October 5, 1950, shown in finding 23.
27. On November 17,1950, C. Harry Chisholm, Charles F. Welsh and Eose J. Mertz, liquidating trustees for the plaintiff, addressed the following letter to the Telephone Company:
Pursuant to resolutions of stockholders adopted September 12, 1950? certified copies of which are in your possession, all rights under the contract dated May 26, 1947, together with all amendments thereto, between Michigan Bell Telephone Company and Telephone Directory Advertising Company have been assigned to stockholders as a liquidating dividend of Telephone Directory Advertising Company. Accordingly, all checks for commissions and other sums due the former Telephone Directory Advertising Company under the contract should in the future be prepared in favor of C. Harry Chisholm and Edward E. Grimes, agents for stockholders of the Telephone Directory Advertising Company, and should be mailed to the office of the agents, 512 Free Press Building, Detroit 26, Michigan, or such other place as you may be advised in writing by said agents.
28. On November 1, 1950, the liquidating trustees of the plaintiff executed an instrument for each of the stockholders, in which a proportionate share of all assets of the plaintiff as of the close of business of that corporation on October 31, 1950, was assigned to each stockholder in consideration of the surrender of the stock of each stockholder to the secretary of the company for full redemption and cancellation subject, however, to the stockholder’s pro rata assumption of all liabilities and expenses of the company then existing or which might later accrue, and subject further to the terms and conditions of the agreement executed by the agents for the stockholders on September 1, 1950, and confirmed at the stockholders’ meeting of September 12, 1950. The stockholders assumed such liabilities in connection with the distribution of the corporate assets in liquidation of the plaintiff.
*706 29. On November 22,1950, the stockholders of the plaintiff filed with the Michigan Corporation and Securities Commission a duly executed certificate of dissolution pursuant to the provisions of section 73 of act 327 of the Public Acts of Michigan, 1931.
30. On October 15, 1951, the Telephone Company addressed the following letter to C. Harry Chisholm, Edward E. Grimes and Max Smitt, agents for the stockholders of the plaintiff:
This will acknowledge receipt from you of a Bill of Sale covering the following assets:
“All brief cases, and all materials and records used in selling directory advertising, compiling directories and supplying information for the billing of customers. These materials and records include all material completed, and in process, required for publishing directories scheduled for publication after October 31,1950; basic contracts carrying customers’ signatures; all customer correspondence, including contest letters and testimonial letters from customers; customer claim files and correspondence and associated records; all records in the Order Entry Department; all cuts, copies of the cut manual and copies of the salesmen’s manuals; art work completed and in progress; promotional material completed and in progress; and advertising patronage records and no patronage records.”
We acknowledge receipt in full of the above assets.
31. Substantially all of the plaintiff’s income was derived from commissions from the sale of subscriptions for advertising in telephone directories of the Telephone Company and compilation work incident thereto. These subscriptions were solicited by the plaintiff through its sales staff. The subscriptions were sold for the life of a particular directory but not for a specified number of months. The subscribers agreed to pay a certain amount per month when billed therefor by the Telephone Company. The subscriber executed a contract reading in material part as follows:
You are hereby authorized to insert the items of advertising listed within in such telephone directories as are specified. The items of advertising requested to be inserted in any particular telephone directory will appear in the first issue of such directory published after the *707 date of this agreement and in each successive issue thereafter until this agreement is TeRminated oe Cancelled in Accordance With the Terms and Conditions on the Final Page Hereof.
The undersigned agrees to pay upon receipt of bill and each and every month thereafter, as long as such items of advertising appear in any telephone directory specified herein, same to be billed by, and payable to, the Michigan Bell Telephone Co.
It is understood and agreed that the total billing under this agreement shall not exceed $_per month in any one month. (Note: As all telephone directories are not published simultaneously, the maximum charge specified above will not be billed until the items of advertising appear in all directories specified. Likewise, if this agreement is terminated, billing will be reduced as new directories are published omitting said advertising.
$ $ $ $ $
TEEMS AND CONDITIONS
1. After publication of the first issue in which the Items of Advertising appear, the Advertiser reserves the right to terminate this agreement by giving written notice to the Telephone Directory Advertising Company on or before the Official Closing Date of any succeeding issue, but charges for advertising already published are to be paid for by the Advertiser. Without further notice the Telephone Directory Advertising Company shall have the right to terminate or cancel this agreement, or may cancel any or all Items of Advertising prior to publication of any issue. Any items not cancelled to be paid for by the Advertiser at regular rates.
2. The Telephone Directory Advertising Company will not (a) Guarantee Position of any space, or (b) be bound by any Verbal Agreements, or (c) be liable for any damages for errors or omissions. Charges for those Items of Advertising wherein the errors or omissions occur will be adjusted.
3. The Telephone Directory Advertising Company shall have the right to reject any or all copy.
4. Any taxes or other charges imposed by any Governmental Authority or Agency upon this agreement shall be added to the price hereof and paid by the Advertiser.
5. The Advertiser warrants that he is the duly authorized agent as to any Items of Advertising wherein he so states.
*708 32. When a new directory was issued by the Telephone Company, it was given a projected life and the plaintiff’s estimated commissions for its services to the Telephone Company in connection with advertising sold for that directory were computed by the plaintiff by multiplying the amount of commissions due for the first month of the directory life by the number of months projected for that directory. The average projected life for directories was ten to twelve months. The Telephone Company had control over the length of time a directory would be outstanding and in use and, because of the exigencies of the telephone business, the Telephone Company frequently extended or curtailed the projected life of the directory by one or two months and, in some instances, for even longer periods, such as three, four, seven or nine months. In soliciting advertising, the plaintiff used the number of months estimated by the Telephone Company as the probable life of a directory — usually ten to twélve months. Where the projected life of the directory was cut back, a subscriber to the advertising therein was not liable for advertising charges beyond the last month the directory was outstanding; and conversely, when the life of the directory was extended, such subscriber was liable for advertising charges for the number of additional months added to the originally projected life. In other words, the subscribers were bound by their contracts to pay the advertising charges only as long as the directory in which their advertisements appeared remained in use.
Whenever telephone services of an advertising subscriber were terminated, it was the policy of the Telephone Company to cancel the advertising contract. Unusual occurrences would affect the amount of commissions to be received by the plaintiff, for example, during certain depression years the plaintiff lost forty percent of its anticipated revenues without losing many subscribers. Also, in recent years when the Telephone Company had a strike, the subscribers to directory advertising refused to pay therefor because they were not receiving telephone service. Because of curtailments and extensions which became necessary in the projected life of the directories, and because of factors such as *709 those just mentioned which affected the amount of commissions to be paid to the plaintiff, it was not possible to make an accurate determination at the time a directory was issued of the amount of commissions the plaintiff would be entitled, to receive during the time a given directory was outstanding and in use.
33. The plaintiff maintained a collateral record which was not a book of original entry showing the monthly allocation of anticipated commissions. Upon the issuance of a telephone directory, entries were made in this record as follows: Under appropriate headings, (1) the number of months in the projected life of the directory; (2) the total amount of anticipated commissions for such life; (3) the amount of monthly commissions to become due in the future; and (4) a .spread of the total anticipated commissions month by month for the proj ected life of the directory. This collateral record formed the basis of the statement forwarded by the plaintiff to the Telephone Company and referred to in finding 34.
34. Prior to the issuance of each new directory, the plaintiff prepared and forwarded to the Telephone Company a statement showing the total estimated gross value of all advertising sold to appear therein, such value being conn-puted by multiplying the charges for one month by the number of months in the projected life of that directory. In addition, such statement showed the monthly amounts to be billed to each subscriber, the total amount of the plaintiff’s commissions based on the projected life of the directories, and the commissions to be paid monthly by the Telephone Company to the plaintiff. On the basis of that statement, the Telephone Company, on the regular bills for telephone service, billed the subscribers each month for advertising charges due under their contracts and in turn paid to the plaintiff the latter’s commissions. Under the contract of May 26, 1947, of the Telephone Company with .the plaintiff, the commissions were payable to the plaintiff monthly by the Telephone Company on the basis of advertising charges collected by the Telephone Company but by an amendment dated November 5, 1949, the payment of commissions to the *710 plaintiff was changed from a collected revenue basis to a gross sales basis as shown in finding 7. Adjustments for uncollected accounts under the contract prior to the amendment of November 5, 1949, were made by the Telephone Company every six months when the Telephone Company billed the plaintiff for commissions previously paid on such uncollected accounts.
.35. In accordance with the collateral record described in finding 33, at the end of the first month in which a new directory was outstanding, the plaintiff entered the total amount of the commissions estimated to be received from advertising sold for that directory as a debit in an account entitled “Commissions Receivable — Advertising” and as a credit to an account entitled “Deferred Revenue — Advertising Commissions — Issued.” No portion of this amount was taken into income by the plaintiff through this entry. However, at the same time and at the end of each following month while that directory was outstanding, the plaintiff debited the account “Deferred Revenue — Advertising Commissions — Issued” with the monthly portion of the commissions it was entitled to receive from the Telephone Company and made a corresponding credit to an account entitled “Revenue — Advertising Commissions.” This monthly portion was treated by the plaintiff as income accruing at the end of the month for which this entry was made. When this monthly amount was paid to the plaintiff by the Telephone Company — usually in the following month — the plaintiff would debit its “Cash — Commissions Receivable” account with that amount and credit “Commissions Receivable — Advertising” with the same amount. Thus if a directory remained outstanding for its originally projected life, the entire amount of commissions entered in the deferred account when the directory was issued would have been accrued by the plaintiff and taken into income through the monthly entries just described. In the event of an extension or cutback in a given directory, appropriate entries would be made in the above accounts at the time of such determination to reflect the increase or decrease in advertising charges and commissions brought about by such change.
*711 The plaintiff paid its individual salesmen each month on the basis of the gross value of sales of advertising made by them. At that time it charged the amounts so paid to an account on its books called “Deferred Expenses — Unissued.” When a directory was issued and the plaintiff became entitled to receive commissions from the Telephone Company on account of advertising sold, the plaintiff charged against such commissions each month a pro rata part of the salesmen’s commissions which had been set up as deferred expenses at the time the advertising was sold.
36. At all times material to this proceeding, the Telephone Company kept a directory outstanding for all of the 160 telephone exchange areas in which the plaintiff operated. Of the telephone directories issued during the period August 1, 1947, to October 31, 1950, the originally projected lives of 126 directories issued by the Telephone Company were either cut back or extended. Most of these directories had lives originally projected for twelve months. While more of the extensions and cut-backs were for one month, there were a number of extensions from two to seven months and of cutbacks from two to nine months.
Of telephone directories in use after October 31, 1950, the originally projected lives of sixteen which had been issued during the period December 1, 1949, to August 1, 1950, were either cut back or extended. The originally projected life of one of these directories was eleven months, another fourteen months, and the remaining fourteen, twelve months. Three of these directories were extended one month each, one two months, and another three months. One directory was cut back four months, another seven months, and nine one month each. These cut-backs and extensions of directories by the Telephone Company are typical of directories issued at least from 1938 to 1948.
37. At the date of the dissolution of the plaintiff on October 31,1950, the work which it had done under its contract with the Telephone Company, for which it had not been paid, was in various stages of completion. In some instances the advertising had been sold, the telephone directories for which this advertising had been sold had been compiled and issued, *712 and these directories were still outstanding and in use. In other instances, the telephone directories were not outstanding and in use but the work done thereon by the plaintiff was in various stages of completion. With respect to work done by the plaintiff on account of which the agents for its stockholders received payment after October 31, 1950, the following tabulation shows the date the canvass for the sale of advertising by the plaintiff for a given directory was closed, the date the copy of the directory was sent to the printer, the date the distribution of the directory was started, and the amounts received by the agents for the stockholders in the period November 1950 to April 1952:

38. The following tabulation shows the months in which the commissions referred to in the previous finding were paid to the agents for the stockholders:
*713 Date Amount of commissions less adjustments
11/50_$88,006.47
12/50_ 87,711.31
1/51_ 87,057.58
2/51_ 86,919. 66
3/51_ 83,607. 55
4/51_ 82,327.53
5/51_ 79,585.86
6/51_ 74,782.96
7/51_ 72,648.29
8/51_ 69,173.67
9/51_ 25,364.73
10/51_ 22,433.52
11/51_ 18,911.38
12/51_ 12,799.06
1/52_ 7,613.12
2/52_ 6,160. 67
3/52_ 6,160. 67
4/52_ 2,330.53
Total_ 913,494. 56
Less: Deferred revenue on the books of plaintiff_277, 565. 05
635,929. 51
The amount of $277,565.05 referred to above as “deferred revenue on the books of plaintiff” represents income received by the agents for the stockholders after October 31,1950, on account of telephone directories which were outstanding and in use on the date of dissolution. That amount appeared on the books of the plaintiff at the date of dissolution in its deferred revenue account and the net amount, $239,941:78, appears as item (a) of the revenue agent’s report in the quotation set out in finding 40 as one of the items of additional income included by the revenue agent. The following reconciliation is made of that amount:
Deferred revenue (City)_ $3, 519. 89
Deferred revenue (State)_ 274,045.16
Total as above_ 277,565.05
Deferred revenue, Ontonagon- 1,129.04
Total_ 278,694.09
Less: Deferred expenses- 38,752.31
Net amount included in agent’s report- 239,941.78
*714 The difference of $86,824.09 between the total amount of commissions paid to the agents of stockholders as set out above ($913,494.56) and the amount set out in the preceding finding with respect to specific directories ($827,170.47) represents amounts otherwise payable to the agents for the stockholders under the contract between the plaintiff and the Telephone Company. Commissions received from the Onton-agon directory (which was not a part of the Michigan Bell Telephone Company) amounted to $1,129.04.
39. The plaintiff kept its books and records and filed its corporate tax returns on the basis of the fiscal year ending July 31. Its final return was filed for the taxable period commencing August 1 and ending October 31, 1950. The plaintiff filed its returns on the basis its books were kept. In finding 35 is set out the manner in which the plaintiff kept its books and records with respect to the commissions received from the Telephone Company. Under that method of accounting, the plaintiff treated the commissions as accruing as income for tax purposes at the end of each month for which an applicable directory was outstanding and charged a pro rata part of the applicable salesmen’s commissions against such income. This method of accounting has been followed by the plaintiff at least since 1931 and its returns have been filed on that basis. Except for the three months’ period ended October 31,1950, these returns have always been accepted by the Commissioner insofar as the method of accounting was concerned.
40. On June 11, 1952, as a result of an examination by a revenue agent, the Commissioner notified the plaintiff of his determination of the deficiencies in income and excess profits taxes referred to in finding 2. That report by the revenue agent included an examination for the fiscal year ended July 31,1950, and for the three months’ period ended October 31, 1950. With respect to the fiscal year ended July 31, 1950, which was prepared on the same basis as for the three months’ period, the revenue agent recommended no change, and the Commissioner accepted that recommendation.
With respect to the three months’ period, the revenue agent recommended adjustments in net income in the total net *715 amount of $791,698.70 which was summarized in his report as follows:
Net income as disclosed by return___ ($19,167.84)
As corrected_ 772,625.86
Net adjustment as computed below_ 791,693.70
Unallowable deductions and additional income:
(a) Net deferred revenues_$239,941. 78
(b) Earned revenues on new directories_ 635,929.51
(c) Sale of lease and other intangible assets_ 100,000. 00
Total__ 975,871.29
(d) Nontaxable income and additional deductions:
Deferred expenses on new directories_$184,177. 59
Total_ 184,177.59
Net adjustment as above_ 791,693. 70
These adjustments were accepted by the Commissioner and formed the basis of the deficiencies which were determined by him and paid by the plaintiff.
41. The first item of the revenue agent’s adjustments in the amount of $239,941.78 represents the net amount of commissions which were paid to the agents of the stockholders of the plaintiff after dissolution of the plaintiff on October 31, 1950, on account of directories which were outstanding on that date. The total amount of such commissions was $278,694.09 and that amount was reflected on the plaintiff’s books on October 31, 1950, as the total credit balance in the “Deferred Eevenue” account described in finding 35. The revenue agent allowed as a charge against such commissions a pro rata part of salesmen’s commissions applicable to such directories in the amount of $38,752.31, which appeared on the plaintiff’s books in its “Deferred Expenses” account likewise described in finding 35, thus producing the net figure of $239,941.78. With respect to this adjustment, the revenue agent stated, in part, as follows:
A consistent method of reporting income clearly reflects income for tax purpose if a taxpayer continues in existence.
The corporate-taxpayer has chosen to liquidate as of October 31, 1950. In its final Income Tax return the corporate-taxpayer failed to report this deferred income.
*716 The second item of the agent’s adjustments described as “Earned revenues on new directories $635,929.51” represents commissions which were paid to the agents of the plaintiff’s stockholders after October 31,1950, on account of work which had been done by the plaintiff prior to that date but with respect to directories which were not issued until after October 31,1950. This sum was not reflected on the plaintiff’s books or records in any manner at the date of liquidation but after liquidation it was recorded on the books of the agents for the stockholders and was subsequently paid to them, as heretofore shown. Against that amount the revenue agent allowed the pro rata part of the applicable salesmen’s commissions on these directories in the amount of $184,177.59 which was described in his report as “Deferred expenses on new directories $184,177.59”. This item had been recorded on the plaintiff’s books at the time the commissions were paid to the salesmen under an item entitled “Deferred Expenses — Unissued” and under its method of accounting a pro rata part would have been allowed as a charge against commissions from the applicable directories. The following explanation was given by the revenue agent with respect to this adjustment:
The corporate-taxpayer prior to October 31, 1950 fully completed the solicitation and compilation of various telephone classified directories to be published. The corporate-taxpayer’s primary contract with the Michigan Bell Telephone Company provided for full commission income to the taxpayer on directories for which solicitation was made.
The taxpayer’s earned revenue on completed directories, but not yet published, amounted to $635,929.51 with deferred expenses of $184,177.59. The taxpayer has failed to report this earned income in its final Income Tax return. Having earned this revenue taxation cannot be escaped by a liquidating conveyance. The commissions in question are taxable as corporate income.
The final item of additional income in the revenue agent’s report “Sale of lease and other intangible assets $100,000” represents the selling price of certain tangible and intangible assets which were sold to the Telephone Company upon the dissolution of the plaintiff as described in findings 23 to 27, inclusive. This item was not reflected in the plaintiff’s books or records of account at the date of liquidation, October 31, *717 1950. It was paid to the agents of the stockholders. The following explanation was given by the revenue agent for this adjustment:
The corporate-taxpayer’s officers entered into substantial negotiations with the Michigan Bell Telephone Company for the sale of various assets.
Agreement of sale was fully completed which [sic] the corporate-taxpayer was in existence. By- agreement possession of the assets was given to the vendees as of November 1, 1950. The sale price was for the sum of $100,000.00.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter .of law that the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States four hundred ninety-three thousand three hundred seventy-eight dollars and forty-one cents ($493,378.41), together with interest as provided by law.

 “§ 41. General Rule.
“The net income shall be computed upon the basis of the taxpayer’s annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *". [26 U. S. C. 1946 ed., sec. 41.]
“ § 42. Period in which items of gross income included — (a) General rule.
“The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. * * *." [26 U. S. C. 1946 ed., sec. 42.]
“ § 47. (g) Returns where taxpayer not in existence for twelve months.
“In the case of a taxpayer not in existence during the whole of an annual accounting period ending on the last day of a month, or, if the taxpayer has no such annual accounting period or does not keep books, during the whole of a calendar year, the return shall be made for the fractional part of the year during which the taxpayer was in existence.” [26 U. S. C. 1946 ed., sec. 47.]