JOHN T. STEWART III TRUST, FIRST NATIONAL BANK OF OMAHA, TRUSTEE, TRANSFEREE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1084–72 — 1087–72.    Filed March 19, 1975.

*James W. R. Brown, T. Geoffrey Lieben,* and *Lyle E. Strom,* for the petitioners.

*Ronald M. Frykberg,* for the respondent.

WILES, *Judge:* The respondent has determined that the petitioners are liable, as transferees, for deficiencies in Federal income taxes due from the National Co. of Omaha, transferor, for the taxable years ended October 31, 1962, and October 31, 1965, as follows:

| Year | Deficiency |
|---|---|
| Oct. 31, 1962 _____ | $8,148.00 |
| Oct. 31, 1965 _____ | 221,927.19 |
| | 230,075.19 |

---

[1] Cases of the following petitioners are consolidated herewith: Bert P. Allen, Transferee, docket No. 1085–72; John T. Stewart IV, Transferee, docket No. 1086–72; and Fredericka N. Stewart Carpenter, Transferee, docket No. 1087–72.

The issues for decision are: (1) Whether National Co. is entitled to nonrecognition treatment pursuant to section 337[2] with regard to gain realized upon the sale of mortgage servicing agreements as part of the sale of all of its assets to First National; and (2) whether legal and accounting fees incurred in connection with the sale of assets are deductible as ordinary and necessary business expenses.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The National Co. of Omaha (hereinafter referred to as National Co.), now dissolved, was a Nebraska corporation with its principal place of business at Omaha, Nebr. The corporation was engaged in the mortgage banking business and operated an insurance agency in a separate department. National Co. kept its books and records on the accrual method of accounting and reported its income for Federal tax purposes on the cash basis method of accounting. National Co. filed its Federal income tax returns for the taxable years ended October 31, 1962, October 31, 1963, October 31, 1964, October 31, 1965, and the taxable period November 1, 1965, through February 23, 1966, with the district director of internal revenue at Omaha, Nebr. At the time petitions were filed, petitioners Bert P. Allen, John T. Stewart IV, and Fredericka N. Stewart Carpenter were legal residents of Omaha, Nebr.; and the office of the John T. Stewart III Trust was located in Omaha, Nebr.

The stockholders of National Co. and their stockholdings on February 23, 1965, and at all times material herein were as follows:

| Shareholder | Number of shares |
| --- | --- |
| John T. Stewart III Trust (including 332 shares in the Fredericka Nash Stewart Division of the Trust) | 878 |
| Bert P. Allen | 408 |
| John T. Stewart IV | 300 |
| Irene Cole Wilson | 100 |
| Prima Co. | 35 |
| Henry Ray Millard, Jr. | 2 |
| Total | 1723 |

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.

In its mortgage banking business, National Co. was engaged in the origination, sale, and servicing of mortgage loans. These loans were originated by direct solicitation of borrowers or by the development of contacts with real estate brokers and construction contractors who referred the potential borrowers to National Co. Upon the making of a new loan, National Co. generally charged a loan commission fee, which was generally offset by the expense of origination. National Co. obtained the funds necessary to make mortgage loans from its own working capital and from the First National Bank of Omaha (hereinafter referred to as First National) on a line of credit. National Co. earned interest income on loans it held for its own account and earned a profit to the extent interest income exceeded interest expense.

After a substantial number of mortgage loans had been built up in National Co.'s portfolio it would sell these loans to approximately 23 institutional investors with which it had developed close relationships over the years because of its respected reputation in servicing the mortgages in a satisfactory manner. These institutional investors included life insurance companies, mutual savings banks, and semiprivate Government organizations such as Federal National Mortgage Association. When National Co. sold a group of loans to an investor it would sell them at the then market value of the loans depending on the rate of interest then prevailing. Thus, National Co. would either realize gain or sustain a loss upon the sale.

Upon a sale of mortgages, National Co. would enter into a servicing agreement with the institutional investor. Under the terms of these agreements, National Co. performed certain services for the investors and received a service fee based on the remaining principal balances of the loans. In February 1965, the average service fee rate being paid to National Co. on the loans it was servicing was approximately three-eighths of 1 percent per year. The agreements provided that they could be terminated for poor service, change of management or servicing personnel, insolvency of the mortgage banker, failure to originate new loans, and other causes. The agreements with many of the institutional investors provided that they were terminable at the will of the investor without cause. In addition, many of the institutional investors had a right to sell all the loans being serviced to other

parties. National Co. could not assign any of its servicing agreements without the consent of the investor parties.

The servicing agreements required National Co. to perform the following services:

(a) Collection of amounts due from the mortgagors including principal, interest, taxes, and insurance.

(b) Remittance of principal and interest to the investors.

(c) Inspection of the mortgage premises at specified times.

(d) Payment of all taxes due on mortgaged premises.

(e) Maintenance of fire and hazard insurance on the mortgaged premises.

(f) Payment of FHA and other mortgage insurance premiums.

(g) Compliance with the requirements of the National Housing Act and other applicable governmental programs.

(h) Performance of certain duties in connection with the foreclosure of mortgages.

(i) Performance of certain duties in connection with the assumption of mortgages and the prepayment of mortgages.

(j) Maintenance of escrow accounts on behalf of each investor to hold prepaid tax and insurance payments.

National Co. retained the amount of the agreed-upon servicing fee out of the funds periodically remitted to the investor. On February 23, 1965, National Co. was servicing 4,710 mortgage loans for 24 investors with principal balances of approximately $52,036,257. The loans were secured by private dwellings and were primarily VA, FHA, or conventional home loans.

Success in the mortgage banking business is dependent on interest rates and on the making and selling of new loans. An important function of the mortgage banker is the origination and sale of new loans to institutional investors, thereby maintaining the investor relationship. To meet inflation and rising costs of servicing, the mortgage banker must make new loans with higher principal balances.

On December 15, 1964, the board of directors of National Co. met in special meeting and authorized its officers to receive offers for the sale of the company. No officer was given authority to bind or enter into a contract on behalf of the corporation at any price.

During December 1964 the officials of First National learned that National Co. might be for sale. First National was engaged in the commercial banking business. It had a mortgage loan

department which prior to 1965 owned just under $10 million in real estate mortgages as security for loans made by the bank. These mortgage loans were being serviced by the bank. Prior to 1965, First National was not engaged in the business of servicing mortgage loans for any institutional investors. In 1964, First National became interested in expanding its mortgage loan department and establishing investor relationships.

As trustee of the John T. Stewart III Trust, the trust department of First National set up a bidding procedure whereby more than one party could make an offer for the stock or assets of National Co. The bidding procedure was established so that the trust department could avoid any appearance of a conflict of interest or self-dealing when the offer of First National was made. By letters dated January 12, 1965, and January 19, 1965, Mrs. J. T. Stewart III and J. T. Stewart IV informed the trust department that a bidding procedure for their shares and for the shares held in trust for them would be acceptable, but that in no event would they be committed to sell to the highest bidder.

On February 5, 1965, a meeting was held between certain shareholders of National Co., trust officers of First National, representatives of First National, and representatives of Regis Hotel Co. The bidders were asked to submit one bid for 1,178 shares of stock of the National Co. and one bid for the purchase of all of the assets of the National Co. subject to its liabilities. First National and Regis Hotel Co. each made written offers to purchase 1,178 shares of stock of the National Co. and also written offers to purchase the assets of National Co. It was announced at the meeting that the offer of First National to purchase the assets was the highest. First National's bid was not accepted on behalf of National Co. at that meeting.

At the bidding on February 5, 1965, First National submitted an offer of $950,888 plus certain liabilities listed on National Co.'s October 31, 1964, balance sheet which totaled $102,177, to purchase the assets of National Co. This amount was comprised of three parts. The amount of $353,787 was for the assets shown on National Co.'s October 31, 1964, balance sheet (other than unrestricted cash, officers and employees accounts, cash value of life insurance, and insurance department assets) less liabilities to be assumed by the bank with respect to such assets. The offer stated that the amount of $471,072 was for "the rights of National to service real estate mortgage contracts." The amount

of $126,029 was for the assets of National Co.'s insurance department which offer was made on behalf of a third party. First National also submitted an offer to purchase 1,178 shares of National Co. stock for $500,000 subject to certain adjustments.

At a special meeting of National Co.'s board of directors held on February 10, 1965, the directors voted to recommend to National Co. shareholders that the company be liquidated and dissolved, that First National's offer to purchase assets be accepted, and that a special meeting of shareholders be held on February 23, 1965, to consider liquidation and acceptance of the offer. Notices of the meeting were mailed to National Co. shareholders on February 10, 1965.

By letter dated February 15, 1965, a representative of First National set forth First National's intent with respect to the offer of February 5, 1965, and particularly with respect to the treatment of assets purchased and liabilities assumed. The letter stated that the purchase price was to be reduced by the amount of certain liabilities to be assumed. In response to this letter a representative of National Co. stated, by letter dated February 16, 1965, that the proposal in First National's February 15 letter was wholly contrary to First National's offer and that no such revision had even been suggested. On February 17, 1965, representatives of the parties held discussions to ascertain precisely what was First National's intent regarding the purchase of assets, the assumption of liabilities, and the purchase price of the business.

During the period February 14 through February 18, 1965, a representative of National Co. made a trip to certain eastern cities to discuss with certain of National Co.'s larger investors whether they would consent to assignment of the servicing agreements and to obtain assurances for First National that the investors would allow First National to continue servicing of the mortgages. The representative assured the investors that the same servicing personnel that had been employed by National Co. would be offered employment by First National and that the investors could be confident of continued good service.

On the morning of February 23, 1965, the shareholders of National Co. met in special meeting. At the meeting the shareholders who were present either in person or by proxy unanimously adopted a plan of liquidation for the company whereby within 12 months from the date thereof National Co.

would sell its assets and distribute all the proceeds to the shareholders in exchange for their shares in proportion to their shareholdings.

In the afternoon of February 23, 1965, First National delivered its amended offer to the shareholders of National Co. The shareholders then met in a special meeting and resolved to accept the amended offer of First National. The amended offer set forth the terms that had been developed during the course of the discussions on February 17, 1965. It required that National Co. obtain consents from the institutional investors to the assignments of its servicing rights. In addition, the amended offer contained substantial revisions of the February 5 offer and added provisions relating to closing, acceptance, and warranties regarding the books and records of the insurance company.

On March 17, 1965, National Co. executed and filed a Form 966 with the Internal Revenue Service. On April 13, 1965, National Co. executed and filed a Statement of Intent to Dissolve with the secretary of state of the State of Nebraska. On February 23, 1966, National Co. executed and filed articles of dissolution with the secretary of state of the State of Nebraska.

National, Co. made the following cash distributions to its shareholders in exchange for their shares:

| Shareholder | 4/14/65 | 7/6/65 | Distributions 7/9/65 | 2/4/66 | Total |
|---|---|---|---|---|---|
| John T. Stewart III Trust | $109,200 | --- | $109,200 | $28,593.25 | $246,993.25 |
| Fredericka Nash Stewart Division of the John T. Stewart III Trust | 66,400 | --- | 66,400 | 17,386.93 | 150,186.93 |
| Bert P. Allen | 81,600 | --- | 81,600 | 21,365.98 | 184,565.98 |
| John T. Stewart IV | 60,000 | --- | 60,000 | 15,708.69 | 135,708.69 |
| Irene Cole Wilson | --- | $20,000 | 20,000 | 5,233.22 | 45,233.22 |
| Prima Co. | --- | 7,000 | 7,000 | 1,831.63 | 15,831.63 |
| Henry Ray Millard, Jr. | --- | 400 | 400 | 108.27 | 908.27 |

A conveyance and assignment of any and all remaining assets was executed February 4, 1966, by National Co. to its shareholders. National Co. did not retain any assets to meet the claims of creditors. After February 4, 1966, National Co. received no income or assets of any kind.

The transfer of National Co.'s mortgage loan and servicing business to First National was made without any interruption in business activity. First National continued the business using the

same office space, files, books, records, and facilities as had been used by National Co. All but one of the 22 or 23 employees in National Co.'s mortgage loan department were immediately hired by the bank. The servicing arrangements with the institutional investors were assigned by National Co. and consented to in the latter part of March 1965. With respect to each of the agreements, First National as assignee agreed to assume the obligations of National Co. thereunder and to perform the services required thereby.

OPINION

The first issue is whether National Co. is entitled to nonrecognition treatment pursuant to section 337 with regard to gain realized upon the sale of mortgage servicing agreements as part of the sale of all of its assets to First National. The petitioner contends that National Co. complied with all of the requirements of section 337 and that accordingly it is not required to recognize any part of the gain realized from the sale including that part relating to the sale of the mortgage servicing agreements. The respondent argues that the mortgage servicing agreements are not "property" within the meaning of section 337 so that gain from the sale thereof is not entitled to nonrecognition. The respondent makes the alternative argument that, assuming the agreements are "property," the gain from the sale of the mortgage servicing contracts must be recognized under the assignment-of-income doctrine.

Section 337 provides that if a corporation adopts a plan of complete liquidation and distributes all of its assets to its shareholders in a 12-month period "then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period." Section 337 was adopted to eliminate the undue weight accorded formalities of certain liquidating transactions that was created by the holdings in *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), and *United States v. Cumberland Public Service Co.,* 338 U.S. 451 (1950). It was intended to provide generally for identical tax consequences to shareholders regardless of whether a corporation sells its assets and then distributes the proceeds to its shareholders in complete liquidation or distributes the assets in kind to shareholders for sale by them. See S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p.

258 (1954); Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 11.64, p. 11–58 (3d ed. 1971).

We will first consider the question whether the mortgage servicing contracts in question are "property" under section 337. Petitioner contends that the mortgaging service agreements are property within the meaning of section 337. Respondent contends that only capital assets come within the definition of property under section 337, and, therefore, any portion of the sales price attributable to the mortgaging service contracts are not property under section 337 because they are not capital assets. Section 337(b) [3] defines "property" in a negative manner by stating that it does not include, generally, inventory items and certain installment obligations. Section 1.337–3(a) of the Income Tax Regulations specifically provides that "With the exceptions listed in this paragraph, the term 'property' includes *all assets* owned by a corporation. [Emphasis added.]" The exceptions listed are those stated in section 337(b). The legislative history underlying section 337 provides generally that nonrecognition treatment is to be provided for the sales of corporate property, except for sales in the ordinary course of business and certain installment obligations. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A107 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., p. 259

---

[3] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(b) PROPERTY DEFINED.—

(1) IN GENERAL.—For purposes of subsection (a), the term "property" does not include—

(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

(B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a)) of stock in trade or other property described in subparagraph (A) of this paragraph, and

(C) installment obligations acquired in respect of property (other than property described in subparagraph (A)) sold or exchanged before the date of the adoption of such plan of liquidation.

(2) NONRECOGNITION WITH RESPECT TO INVENTORY IN CERTAIN CASES.— Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term "property" includes—

(A) such property so sold or exchanged, and

(B) installment obligations acquired in respect of such sale or exchange.

(1954). The House report, *supra* at p. A107, gives the following example:

For example, if a corporation engaged in owning and operating filling stations were to liquidate under section 336, the continued sale of gasoline to motorists during the course of winding up its business would still be considered to give rise to income taxable at the corporate level.

We find no basis in the legislative history to warrant respondent's contention that the term "property" as defined under section 337 includes only capital assets. The expansive definition of property stated in respondent's regulations, without attempting to limit the definition only to capital assets, provides clear recognition of this fact. Furthermore, limiting the term "property" to capital assets does not comport with the treatment, under section 337(b)(2), of a bulk sale of inventory as "property" even though inventory clearly is not a capital asset. This issue has recently been considered by the Sixth Circuit in *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States*, 485 F. 2d 110, 117 (C.A. 6, 1973), as follows:

A reasonable reading of the statute in light of its limited legislative history suggests that in adopting the language of subsection 337(b)(1)(A), Congress intended nothing more than to exclude from the statute's nonrecognition provisions gain or loss from a corporation's sales in the ordinary course of its business during the 12-month period. * * *
  * * *

It appears that this intent of Congress led to its adoption of the language appearing in subsection 337(b)(1)(A), drawn from subsection 1221(1), with the latter subsection's similar, albeit broader, purpose of isolating one type of "profits and losses arising from the everyday operations of a business." [Citing cases.] This approach appears to explain Congress's failure to further include in subsection (b)(1)(A) the types of property described in subsections 1221(2) through (5), such as property used in the trade or business and accounts receivable, which are not normally sold in the ordinary course of a corporation's business. It further appears to explain Congress's decision to afford nonrecognition to bulk sales of inventory and property held primarily for sale to customers under subsection 337(b)(2), in that such property is not normally sold in bulk to a single purchaser in the ordinary course of a corporation's business.

In the light of the express language of the statute, section 1.337–3 of the Income Tax Regulations, and the reasoning of the Sixth Circuit in the *Midland-Ross* case, we hold that the term "property" under section 337 is not limited to capital assets. See on this point *Hollywood Baseball Association v. Commissioner*, 423 F. 2d 494 (C.A. 9, 1970), certiorari denied 400 U.S. 848

(1970).[4] In reaching this holding, we have considered the contrary position stated in *Pridemark, Inc. v. Commissioner,* 345 F. 2d 35 (C.A. 4, 1965), and found it unpersuasive.

In *Coast Coil Co.,* 50 T.C. 528 (1968), affirmed per curiam 422 F. 2d 402 (C.A. 9, 1970), this Court held that accounts receivable are not property as they fall within the definition of "installment obligations" under section 337(b)(1)(B) and therefore the loss realized upon their sale should be recognized by petitioner. As an alternative rationale, this Court, relying on *Pridemark, Inc. v. Commissioner, supra,* held that only capital assets fall within the scope of property as defined by section 337(b)(1). Since this rationale was an alternative holding which relied on the *Pridemark* case, a decision which this Court has found to be unpersuasive in light of the *Midland-Ross* opinion, we find that case to be of little precedential value in the present case. Also, the decision of this Court in *Frank W. Verito,* 43 T.C. 429 (1965), is not in point, for in that case it was found that the assets were in fact capital assets and thus property within the meaning of section 337.

Applying the above holding to the facts of this case, we find that the mortgaging service contracts were clearly assets of petitioner and were not subject to any of the specific exclusions enumerated in section 337(b). We therefore hold that they qualify as "property" under section 337.

Respondent alternatively argues that, even if the contracts are property within the meaning of section 337, the sale of the contracts results in an assignment of income and gain or loss must be recognized under the assignment-of-income doctrine. In their brief, petitioners concede that taxpayers must recognize ordinary income in liquidation transactions, such as section 337, when earned income is assigned. In *Frank W. Verito,* 43 T.C. 429, 441 (1965), this Court stated that "Clearly, it was not the purpose of section 337 to allow the sale of the right to receive income to escape taxation." Accordingly, we hold that the assignment-of-

---

[4] In *Hollywood Baseball,* both this Court and the Circuit Court of Appeals, in applying the *Corn Products* doctrine to exclude a sale from the benefits of sec. 337, emphasized that an agreement to sell the contracts involved therein was a prerequisite to the ability of the taxpayer to conduct its business. That case does not stand for the proposition that all *Corn Products* assets are excluded from the benefits of sec. 337. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, p. 11-71 (3d ed. 1971). Here, the sale of the mortgage servicing contracts was not a prerequisite to National Co.'s conduct of its business and we therefore consider *Hollywood Baseball* distinguishable. Cf. *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States,* 485 F. 2d 110 (C.A. 6, 1973).

income doctrine may be invoked to require the recognition of income notwithstanding the application of section 337. *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States*, 485 F. 2d 110 (C.A. 6, 1973); *Commissioner v. Kuckenberg*, 309 F. 2d 202 (C.A. 9, 1962), reversing 35 T.C. 473 (1960), certiorari denied 373 U.S. 909 (1963). Cf. *Estate of David B. Munter*, 63 T.C. 663 (1975). Having thus determined that an assignment of income would result in the recognition of income, we must next ascertain whether there was an assignment of income in this case.

Petitioner argues that there is no assignment of income in this case because the income had not been earned by National Co. For the reasons stated hereinafter, we agree.

Since the main objective of section 337 was to provide identical tax consequences whether a corporation sells its assets and then distributes the proceeds to its shareholders in complete liquidation or distributes the assets in kind to its shareholders, there arises, at least in most circumstances, a need for parity between sections 336[5] and 337. See *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States, supra* at 118, and *Estate of David B. Munter, supra* at 676-677. To hold otherwise would cause, in many situations, taxability at the corporate level to turn upon the form of the transaction, i.e., whether the asset is sold by the corporation or distributed directly to the shareholders. Thus, in determining whether there is an assignment of income in this case, due consideration must be given to the unique relationship between sections 336 and 337.

Therefore, decisions regarding the application of the assignment-of-income doctrine to section 336 are of particular importance. For example, in *United Mercantile Agencies*, 34 T.C. 808 (1960), this Court held that the assignment-of-income doctrine did not apply to require recognition of income upon the distribution of delinquent accounts receivable because the distributing corporation had not "earned" any income from the property.[6] Also, in those cases which have applied the

---

[5] SEC. 336. GENERAL RULE.

Except as provided in section 453(d) (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.

[6] Although this issue was not presented directly in *Shea Co.*, 53 T.C. 135 (1969), this Court stated at p. 157, that "Respondent does not contend that any anticipatory assignment of income was made by the Shea Co. upon its dissolution. Such a contention would have little merit in light of the absence of any earned income or income over which the Shea Co. had any 'control' at the time of assignment of the contested claims."

assignment-of-income doctrine over the nonrecognition provisions of section 336, the income had been fully earned by the corporations. See *Wood Harmon Corporation v. United States*, 311 F. 2d 918 (C.A. 2, 1963); *Williamson v. United States*, 292 F. 2d 524 (Ct. Cl. 1961). Cf. *Siegel v. United States*, 464 F. 2d 891 (C.A. 9, 1972).

Although the issue involved herein has not been faced directly under section 337, the Sixth Circuit in *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States, supra,* stated that the assignment-of-income doctrine applied to the "portion of the total estimated profits deemed to have been *earned* through its partial performance of those contracts." (Emphasis added.) Likewise, in *Commissioner v. Kuckenberg,* 309 F. 2d 202 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963), the assignment-of-income doctrine was utilized to subject income to taxation despite section 337 because the income was completely earned by full performance of the contracts by the corporation in question.

Respondent cites *United States v. Eidson,* 310 F. 2d 111 (C.A. 5, 1962), and *Robert E. Foxe,* 53 T.C. 21 (1969), as support for his position. Neither of these cases dealt with assignment of income under section 337. They, therefore, are distinguishable.

In this case, National Co. received its fee only after it had performed the services and it received no fees for services that it had not performed. After the sale, First National assumed the servicing obligations of National Co. and received fees for the services which it performed. Thus, First National made no payment for the right of income in respect of services that had previously been performed by National Co. Therefore, we hold that there is no assignment of income in this case.

In light of our findings that the assets under consideration are "property" under section 337 and that there is no assignment of income present, it is unnecessary for this Court in the instant case to allocate the sale price between ordinary income and capital income items.

The second issue is whether legal and accounting fees incurred by National Co. in connection with the sale of its assets to the bank are deductible as ordinary and necessary business expenses. We conclude that legal and accounting fees incurred in connection with the sale of assets in the course of a complete liquidation are not deductible as ordinary and necessary business expenses. *United States v. Morton,* 387 F. 2d 441 (C.A. 8, 1968).

An appeal from the decision in the instant case lies solely to the Eighth Circuit. Under *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), we are required to follow the Eighth Circuit's decision. We note, however, that this Court has, consistent with the views of the Eighth Circuit decision in *Morton,* held that such expenses are not deductible. *Pridemark, Inc.,* 42 T.C. 510 (1964), revd. 345 F. 2d 35 (C.A. 4, 1965). In *Of Course, Inc.,* 59 T.C. 146 (1972), revd. 499 F. 2d 754 (C.A. 4, 1974), we further expressed our view that such expenditures should not be treated as deductible expenses even though we were required under *Jack E. Golsen, supra,* to allow such expenses in that case. On appeal, the Fourth Circuit reversed its position in the *Pridemark* decision and adopted the position that such expenses are not deductible as ordinary and necessary business expenses.

Reviewed by the Court.

*Decisions will be entered under Rule 155.*

TANNENWALD, *J.,* concurring: I concur in the majority decision and opinion with the additional observation that, as Judge Wiles points out, the parity between sections 336 and 337 may not be absolute. See my concurring opinion in *Estate of David B. Munter,* decided this day (63 T.C. 663).