ROBERT H. STORZ AND MILDRED T. STORZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ROBERT H. STORZ, TRANSFEREE OF STORZ-WACHOB-BENDER CO., A DISSOLVED CORPORATION *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8292–71, 8293–71. Filed April 26, 1977.

*Kent O. Littlejohn* and *David M. Pedersen*, for the petitioners.

*Ronald M. Frykberg*, for the respondent.

FAY, *Judge:* Respondent determined a liability against petitioner Robert H. Storz, as transferee, with respect to a deficiency determined against Storz-Wachob-Bender Co., transferor, in the amount of $58,494.38 for the taxable period April 1, 1966, to February 20, 1967. The issue for decision (docket No. 8293-71) is whether a portion of the amount received by Storz-Wachob-Bender Co. for the sale of its business represented payment for the assignment of income which it had already earned and was, therefore, taxable to Storz-Wachob-Bender Co. as ordinary income. Petitioner Robert H. Storz has conceded that he would be liable as transferee of Storz-Wachob-Bender Co., a dissolved corporation, in the event that the deficiency determined against that company is sustained.

Respondent determined a deficiency of $25,531.31 in income tax of petitioners Robert H. Storz and Mildred T. Storz for the taxable year 1967 (docket No. 8292-71). Certain other adjustments having been conceded by petitioners, the sole issue for decision in docket No. 8292-71 is whether petitioners are entitled to a deduction for a demolition loss in connection with the demolition of two buildings in 1967.

### FINDINGS OF FACT

Some of the facts have been stipulated, and are so found.

At the time of filing their petition herein (docket No. 8292-71), petitioners resided in Omaha, Nebr. They filed a joint Federal income tax return for the year 1967 with the District Director of Internal Revenue in Omaha, Nebr.

Robert H. Storz, the sole petitioner in docket No. 8293-71, is a transferee, within the meaning of section 6901,[1] of the assets of Storz-Wachob-Bender Co., a dissolved corporation.

---

[1] All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Storz-Wachob-Bender Co. (hereinafter referred to as S-W-B) filed a Federal income tax return with the District Director in Omaha, Nebr., for the taxable period April 1, 1966, through February 20, 1967.

S-W-B, prior to its liquidation and dissolution, was engaged in the investment banking business and was owned by petitioner.[2] Its principal business activity was the underwriting of, and trading in, various types of municipal and corporate securities. In the underwriting of securities the investment banker earns income by assisting entities seeking financing in the sale of their securities to investors. S-W-B utilized the accrual method of accounting, and in accordance with industry practice, recognized income from underwriting activities only upon completion of the underwriting. In the securities industry until the securities proposed to be sold are actually sold, there exist material legal and marketing contingencies affecting the ultimate completion and the total dollar amount of the proposed transaction.

On March 8, 1966, S-W-B adopted a plan of complete liquidation in accordance with section 337. On March 9, 1966, S-W-B entered into an agreement with First Nebraska Securities, Inc. (First Nebraska), providing for the sale to First Nebraska of all of the assets and business of S-W-B as a going concern. First Nebraska, through a subsidiary, was also engaged in the investment banking business. The agreement provided that the purchase price was to be an amount equal to the net book value of S-W-B's assets, less liabilities, plus the sum of $230,000. The agreement did not specify for what the additional sum of $230,000 was being paid. However, it did provide that if at least 6 of the 10 registered representatives employed by S-W-B did not continue their employment after the sale to First Nebraska, the purchase price for the business would be reduced by $16,667 for each registered representative (in excess of 4) who did not so continue.

At the time of the March 9, 1966, purchase agreement S-W-B had various investment banking arrangements and underwriting contracts in process, which were in various stages

---

[2] All references to petitioner in the singular are to Robert H. Storz. Mildred T. Storz is a party in docket No. 8292–71 solely by reason of having filed a joint return with Robert H. Storz.

of completion, but which were not reflected on S-W-B's balance sheet. These included at least 25 underwriting contracts for equity securities, private placement of debt, municipal bond issues, and sanitary and improvement district bond issues.

Two of the major contracts included among these were for a private placement of debt securities and a public offering of common stock, both for Great Plains Natural Gas Co. (Great Plains). In April 1965, S-W-B had prepared a financing plan for Great Plains, which included the private placement, followed by the public offering. In connection with this plan, S-W-B in September 1965 obtained a commitment from certain institutional investors for the purchase of the debt securities; however, this commitment contained, as a condition precedent to the purchase, a requirement that Great Plains first complete its public offering of common stock. On September 28, 1965, S-W-B wrote to Great Plains to advise that the debt placement commitment had been obtained. The letter contained the following pertinent language:

It is customary in our industry that our fee of 2–½% for serving as your agent in the placement of $2,700,000 of bonds and notes would be payable when the commitment letter is accepted and signed. However, in view of the present formative stage of your company, it is agreeable with us to receive our fee at the time you receive the proceeds of the public offering of Class A common stock.

At the time of the purchase agreement with First Nebraska, a substantial amount of work had been done by S-W-B in connection with the Great Plains public offering. The required registration statement had been filed with the Securities and Exchange Commission (SEC), although it had not been declared effective by the SEC, and copies of the prospectus and draft underwriting agreement had been distributed to prospective co-underwriters.

In addition to the Great Plains offering, S-W-B also had pending a proposed public offering of stock of Data Documents, Inc. Prior to the date of the First Nebraska purchase agreement, S-W-B had done a substantial amount of work in connection with the Data Documents offering. The registration statement had been filed with the SEC, although it had not yet been declared effective, and there was considerable

investor interest in purchasing the shares at the proposed offering price.

At the time that the purchase agreement with S-W-B was being negotiated, representatives of First Nebraska were aware of many of the investment banking contracts which S-W-B had in process and their approximate stages of completion. At least a portion of the $230,000 "premium" to be paid for S-W-B's business was considered by First Nebraska representatives to be recoverable from the income expected to be received upon completion of S-W-B's contracts in process which would be acquired.

Sometime after the execution of the March 9, 1966, purchase agreement, but prior to the closing, First Nebraska's attorney, Warren C. Johnson, advised First Nebraska officials that at least a portion of the $230,000 purchase premium represented "purchased income," and that such portion should be computed and treated as such on the records of First Nebraska. It was agreed that, following the closing, S-W-B's records would be examined to determine a proper amount to be so treated.

The closing of the transaction occurred on April 4, 1966. Several of the S-W-B underwriting contracts in process were completed shortly after the closing and the income therefrom was received by First Nebraska. Included among these were the public offering and private placement for Great Plains, completed on May 5, 1966, from which First Nebraska received a total of $64,400 which would otherwise have been received by S-W-B. The public stock offering for Data Documents, Inc., was completed April 21, 1966, from which First Nebraska received a total of $50,400. In July 1966, Johnson met with Charles J. Burmeister, a First Nebraska officer, to discuss the question of the portion of the S-W-B purchase price allocable to "purchased income." Burmeister had previously reviewed the S-W-B records concerning details of the contracts in process at the time of the purchase agreement. Johnson and Burmeister then computed what they considered to be the portion of the income received or to be received from the S-W-B contracts which should be deemed to have been earned by S-W-B prior to the sale, and therefore constituted "purchased income" to First Nebraska. This was done by computing the amounts of gross income actually

received or to be received by First Nebraska and reducing such amounts by applicable percentage of completion factors and expenses incurred or to be incurred in completing the contracts subsequent to acquisition. The resulting income figures were as follows:

| | |
|---|---:|
| Great Plains—private placement | $29,475.00 |
| Great Plains—public offering | 15,778.50 |
| Data Documents—public offering | 23,715.00 |
| Brandeis industrial development bond issue | 21,500.00 |
| Nashua industrial development bond issue | 3,333.00 |
| Municipal bond issues | 12,130.00 |
| Sanitary and improvement district bond issues | 21,450.00 |
| Church bond issue | 1,650.00 |
| Federal agency bonds | 820.00 |
| | 129,851.50 |

These figures were reviewed by First Nebraska's accounting firm, and subsequently the allocation of $129,851.50 to "purchased income" was approved by the board of directors. This total amount was removed from the income accounts on First Nebraska's books, thus reducing net income reported on its Federal income tax return for the taxable year ended March 31, 1967.

S-W-B did not report any part of the purchase price paid by First Nebraska as taxable ordinary income on its return for the period April 1, 1966, to February 20, 1967. S-W-B was subsequently dissolved. Respondent determined that S-W-B had realized taxable ordinary income in the amount of $129,851.50 in connection with the sale to First Nebraska and determined an income tax deficiency based thereon for S-W-B's taxable period ended February 20, 1967. Such deficiency was assessed against petitioner, as transferee of S-W-B.

During 1960 petitioner purchased a building located at 3421 Farnam Street, Omaha. In 1962 petitioner purchased another building at 3504 Harney Street, which abutted the Farnam Street property back-to-back. One building was rented for use as a mortuary and the other was rented as an apartment building. By 1967 both buildings were in need of substantial repairs, the tenants had vacated, and petitioner considered the buildings unrentable. Accordingly, in August 1967 petitioner had the buildings demolished in order to get them off the real estate tax rolls. Petitioner claimed an abandonment

and demolition loss deduction of $35,016.74 in his 1967 income tax return.

On June 21, 1968, both then-vacant lots were sold by petitioner to his wholly owned corporation, Storz Broadcasting Co. The corporation purchased the property as an investment, based upon the increasing new commercial development of the surrounding neighborhood. In addition, at the time of the purchase Storz Broadcasting Co. had been investigating the possibility of acquiring a radio station which occupied premises adjoining the property. Such acquisition never took place, however, and the property has remained as vacant land.

#### ULTIMATE FINDING OF FACT

Petitioner's demolition of the buildings on Farnam and Harney Streets in August 1967 was independent of his later sale of the vacant land to Storz Broadcasting Co. in June 1968.

#### OPINION

S-W-B adopted a plan of complete liquidation under section 337, and pursuant to that plan, it sold its entire business to First Nebraska. Ordinarily, such a sale would be without income tax consequences under section 337. However, respondent contends that section 337 does not extend to such portion of a liquidation as represents an assignment (or sale) of income, and that liquidation proceeds in consideration for assigned income must be reported as ordinary income by the liquidating corporation. Petitioner does not dispute this view of section 337, which indeed is supported by several Court decisions. *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States*, 485 F.2d 110 (6th Cir. 1973); *Commissioner v. Kuckenberg*, 309 F.2d 202 (9th Cir. 1962), affg. on this issue 35 T.C. 473 (1960), cert. denied 373 U.S. 909 (1963); *Stewart Trust v. Commissioner*, 63 T.C. 682 (1975).[3] However, petitioner vigorously disputes respondent's contention that S-W-B's sale to First Nebraska involved any assignment of income. The income in question here is underwriting compensation with

---

[3] *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States*, 485 F.2d 110 (6th Cir. 1973), and *Stewart Trust v. Commissioner*, 63 T.C. 682 (1975), contain detailed analyses of the question whether uncompleted contracts constitute "property" within the meaning of sec. 337(a) and (b).

respect to numerous contracts for the underwriting or placement of securities, which contracts were in various stages of completion at the time S-W-B's business was sold to First Nebraska.

Initially, petitioner contends that, as a factual matter, the $230,000 "premium" paid by First Nebraska in the purchase of S-W-B's business was paid in order to obtain the valuable services of several key employees of S-W-B, and was not paid for potential future income from S-W-B's uncompleted underwriting contracts. The agreement between S-W-B and First Nebraska does not specify for what the $230,000 premium was being paid. Although not necessarily by design, this left both parties free to view the payment in the manner which would minimize its own income tax consequences—to the potential ultimate detriment of the fisc. While the record contains testimony from both sides as to what was intended to be purchased/sold for the $230,000 premium, it seems clear that in a transaction such as the one at issue here, involving the purchase of a profitable going business, the consideration paid must represent a variety of elements, tangible and intangible. Certainly, it cannot seriously be contended that S-W-B's uncompleted underwriting contracts were not at least an intangible element in First Nebraska's evaluation of S-W-B's going business. However, for the reasons set forth hereinafter, we have concluded that, regardless of what portion of the $230,000 premium may be deemed to have related to these contracts, the transaction did not involve a taxable assignment of income by S-W-B.

The assignment-of-income doctrine goes all the way back to the landmark cases of *Lucas v. Earl,* 281 U.S. 111 (1930); *Helvering v. Horst,* 311 U.S. 112 (1940); and *Helvering v. Eubank,* 311 U.S. 122 (1940). The principle enunciated in *Helvering v. Eubank, supra,* is that income is taxable to him who *earns* it, even though the right to receive the income may have been transferred to another. Thus, the question here is simply whether S-W-B had, prior to the sale to First Nebraska, "earned" any of the underwriting income which was later received by First Nebraska.

A thorough examination of the assignment-of-income doctrine in the context of the transfer of business contracts may be found in *Williamson v. United States,* 155 Ct. Cl. 279, 292

F.2d 524 (1961). In that case, a corporation which had been engaged in the business of servicing oil and gas wells on a contract basis was liquidated and all of its assets distributed to its sole stockholder. Included among these assets were $192,052.08 in accounts receivable "for services rendered by the corporation in full performance of various well-servicing contracts prior to the date of distribution." (292 F.2d at 526). The court held that the income represented by these assigned receivables had been earned by the transferor corporation, and was, therefore, taxable to the corporation. In reaching this conclusion, however, heavy emphasis was placed upon the fact that the income in question was for contracts fully performed and as to which the assigning corporation had unconditionally earned the income. The court distinguished its own then-recent case of *Telephone Directory Advertising Co. v. United States*, 135 Ct. Cl. 670, 142 F.Supp. 884 (1956), in which it had held the assignment-of-income doctrine inapplicable. In that case a corporation in dissolution had assigned contract rights to prospective commissions with respect to future advertising revenues of its client, but the Court found that the assignor did not have a fixed and determined right to receive the commissions at the time of the assignment. The court in *Williamson* stated as follows:

The distinctions between the Telephone Directory case and the instant case are apparent. The Williamson Corporation had a fixed right to future income on the date of its dissolution. It alone had earned the income; it had done everything necessary to perfect its right to the income; the money was due and owing the corporation on the date of dissolution. [292 F.2d at 529.]

If the foregoing represents a guiding statement of elements of applicability of the assignment-of-income doctrine, it clearly appears that there has not been such an assignment in the instant case. Although S-W-B had performed considerable services in connection with many of the contracts eventually taken over by First Nebraska, it had not completely performed any of such contracts to the point where it had a fixed and determined right to income therefrom.[4] All events

---

[4] In the case of sanitary and improvement district bond issues partial compensation in the form of warrants is paid to the underwriter prior to the actual bond issue. However, respondent has not asserted that any such warrants which S-W-B had earned prior to the First Nebraska sale had not already been received and taken into income by S-W-B.

necessary to entitle S-W-B to its income had not occurred, and none of the income in question was due and owing to S-W-B at the time of the sale of its business.

Respondent relies heavily on the fact that as to several of the contracts in question, including the Great Plains and Data Documents public offerings, S-W-B had performed its services to such an extent that the officers of First Nebraska, in negotiating the purchase agreement with S-W-B, considered the underwriting income as substantially earned and "like money in the bank." This is borne out by the fact that within 57 days after the execution of the purchase agreement, both of these offerings were in fact completed, and First Nebraska received $114,800 in underwriting and fee revenues which otherwise would have been received by S-W-B. There can be little doubt that the prospective income from S-W-B's contracts in process was an important consideration of First Nebraska in arriving at the purchase price for S-W-B's business. After the purchase First Nebraska made what appears to be a reasonable analysis of the contracts in process at the time of purchase and the relative stages of completion of each for purposes of its own computation of the amount of "purchased income." Respondent has in effect endorsed First Nebraska's approach and its computations. While this approach has theoretical merit, it simply does not accord with existing case law on assignment of income.

Despite the substantial completion by S-W-B of its services under many of the assigned contracts, the controlling fact in this case is that under standard practice in the investment banking industry, no income is earned until the securities are finally sold and the issuer receives his money. Unless other arrangements are agreed to, the investment banker is entitled to no compensation unless and until the securities are sold, regardless of the amount of time and money expended in partial performance prior to that point. In the instant case, this point of entitlement did not occur (i.e., the income was not "earned," within the meaning of *Helvering v. Eubank*, 311 U.S. 122 (1940)) until after the contracts had been transferred to First Nebraska. See also sec. 1.446–1(c)(ii), Income Tax Regs., which states that income is includable in taxable income when "all the events have occured which fix the right

to receive such income and the amount thereof can be determined with reasonable accuracy."

The evidence presented by petitioner amply establishes, not only that investment banking income is not normally earned until the securities are finally sold, but that, until such sale is completed, there are significant legal and marketing contingencies affecting its ultimate consummation as well as the selling price and amount of compensation to the investment banker. With but one exception, respondent has not attempted to establish that S-W-B had fully earned and was *entitled* to receive compensation with respect to any of the investment banking contracts in question. The single exception is the private placement of debt for Great Plains. Respondent makes much of S-W-B's letter to Great Plains in which S-W-B states that it has obtained a commitment for the purchase of the securities, and that it became entitled to its commission for the placement upon receipt of such commitment. However, the same letter goes on to state that S-W-B would agree to defer this commission until completion of Great Plain's forthcoming public offering of common stock. Moreover, the investors' commitment for the private purchase of the debt securities was itself specifically made contingent upon the prior completion of the public stock offering. In these circumstances, it seems doubtful that the debt placement commission would have been paid if neither the common stock offering nor the debt placement had eventually been completed.[5]

Our position herein is consistent with two recent cases of this Court in which the assignment-of-income doctrine was held inapplicable in factual circumstances similar to those in the instant case. In *Stewart Trust v. Commissioner,* 63 T.C. 682 (1975), a corporation in the mortgage servicing business sold its mortgage servicing contracts in connection with a section 337 liquidation. The mortgage servicing income to be received in the future from these contracts was relatively fixed and determinable at the time of sale. The Commissioner determined that such income was taxable to the selling

---

[5] Although the record herein gives every indication that all of the parties at all times assumed that the Great Plains common stock offering would be completed in due course as originally planned, the fact remains that all of S-W-B's compensation in connection therewith remained contingent until it was in fact completed.

corporation as an assignment of income. We held that the assignment-of-income doctrine did not apply since the income to be received in the future had not been earned by the seller prior to the sale and would be received by the purchaser only for services to be performed by it after the purchase.[6]

In *Schneider v. Commissioner*, 65 T.C. 18 (1975), decided only a month prior to the trial of the instant case, a corporation owning rights to a popular motion picture and a television series entered into distribution contracts, pursuant to which it was to receive royalties from showings of its films. The distribution companies were to account for gross receipts and compute and pay royalties based thereon on a regular periodic basis. The corporation was subsequently dissolved and its assets, including the royalty contracts, distributed to its stockholders. Royalty payments were thereafter received directly by the stockholders. The Commissioner, applying section 446, determined that all or a portion of the first royalty payments made to the stockholders after the distribution was earned by, and should be taxable to, the corporation prior to the distribution. We sustained this determination with respect to one royalty payment as to which all events necessary to fix the net amount earned had occurred prior to the date of transfer. However, as to two other payments received after the liquidating transfer, we held that the corporation "had no fixed determinable right to an ascertainable amount of income at the time of its liquidation." (65 T.C. at 29.) As to these payments there existed, at the time of the liquidating distributions, significant contingencies affecting the ultimate amount, if any, which was to be later received. Such contingencies related to both the ultimate amount of gross rentals with respect to which royalties were

[6] We recognize that in the instant case varying degrees of services had been performed by S-W-B with respect to the various investment banking contracts prior to their transfer to First Nebraska. However, we do not consider this materially significant, since the activity which ultimately "earns" the income in an underwriting contract is final sale to investors of the securities being issued. This is not to say that in no instance could the transfer of an underwriting contract amount to a taxable assignment of earned income. If, for example, the sale to First Nebraska had occurred after the sale of the Great Plains common stock had been confirmed to investors, but before final payment to S-W-B of its underwriting compensation, S-W-B would be deemed to have earned its income, which income would at that point amount to an account receivable. The situation would then fall squarely within the ambit of *Williamson v. United States*, 155 Ct. Cl. 279, 292 F.2d 524 (1961).

computed and the distribution costs to be deducted before arriving at the net royalty to be paid by the distribution company. As in the instant case, the gross receipts could have been affected by a variety of factors, including cancellations or renegotiation of agreements. In this respect, the factual parallels between the instant case and *Schneider* (in which the Commissioner acquiesced[7] subsequent to the trial and briefing in this case) are so significant, as to make the two cases virtually indistinguishable.

Respondent relies heavily on *Midland-Ross Corp., Tr. of Sur. Com. Corp. v. United States,* 485 F.2d 110 (6th Cir. 1973), which also involved a sale of uncompleted contracts in a section 337 liquidation. In that case it was held that the amount received for the long-term contracts in process represented income to the liquidating corporation under the assignment-of-income doctrine. We believe that the *Midland-Ross* case is factually distinguishable from the instant case in that in *Midland-Ross* the assigned contracts were long-term construction contracts upon which the assigning corporation had previously received progress payments and had earned its income with respect to the portion of the job completed prior to the assignment. The fact that the assignor, under the completed contract method of accounting, did not recognize any income or expenses until completion of the contracts, was not a bar to recognition of the portion of the income theretofore earned, upon assignment of the contract before completion. See *Jud Plumbing & Heating v. Commissioner,* 153 F.2d 681 (5th Cir. 1946), affg. 5 T.C. 127 (1945). Moreover, in *Midland-Ross,* both parties to the sale in liquidation agreed upon the value of, and "purchase price" allocable to, the uncompleted contracts. In the instant case, such determination was made unilaterally by the purchaser, subsequent to the closing of the purchase, despite the fact that under industry practice no income would be earned on the underwriting contracts until their final completion.

Accordingly, we hold that no portion of the purchase price received by S-W-B for the sale of its business to First Nebraska represented a taxable assignment of income; the entire transaction qualifies for nonrecognition under section

---

[7] 1976–2 C.B. 2.

337. *Stewart Trust v. Commissioner,* 63 T.C. 682 (1975); *Schneider v. Commissioner, supra.*

The second issue herein involves petitioner's claimed demolition loss deduction in 1967 in connection with the demolition of his buildings on Farnam and Harney Streets. With certain exceptions, the cost of demolition of a building is deductible as a loss under section 165, as amplified by sec. 1.165–3, Income Tax Regs. Although the regulations provide that no deduction is permitted if the building was originally purchased with intent to demolish, the record does not indicate such an intent by petitioner when he purchased the two buildings in question at least 5 years prior to their demolition.

Respondent seeks to disallow the claimed deduction on the grounds that the demolition of the buildings was an integral part of the transaction in which the property was eventually sold to Storz Broadcasting Co. He asserts that at the time of the demolition, petitioner already intended to sell the underlying land to the corporation, and therefore, the demolition was not an independent loss transaction. Thus, respondent contends, the basis of the demolished buildings should not be deductible as an ordinary loss, but should be included in the basis of the property sold in computing the capital gain or loss on such sale. Ample authority exists for this approach. In *Standard Linen Service, Inc. v. Commissioner,* 33 T.C. 1 (1959), the taxpayers owned property on which existed several buildings in an advanced state of disrepair. They decided to demolish the buildings but took no steps to do so. Later they contracted to sell the property for use as a parking lot, and the contract of sale required that the buildings be demolished by the sellers. We held that, despite the previously formed intention to demolish, the actual demolition was an integral part of the sale of the property and should be treated as a selling expense. See also *Simmons Mill & Lumber Co., Inc. v. Commissioner,* a Memorandum Opinion of this Court.[8] Cf. *Fox v. Commissioner,* 50 T.C. 813, 818 (1968), affd. per curiam by an unreported order (9th Cir. 1970).

Thus, the question here is strictly a factual one: Did petitioner demolish the buildings as an integral part of the

---

[8] T.C. Memo. 1963–185.

later sale transaction? We think not, and we have so found as an ultimate fact. Unlike in *Standard Linen Service, Inc. v. Commissioner, supra,* there was no contractual condition requiring demolition prior to the sale. (In fact, there apparently was not even a written contract of sale.) The sale did not take place until nearly a year after the demolition. Petitioner testified under repeated cross-examination that at the time of the demolition there was no contract, nor even a plan, to sell the property to Storz Broadcasting Co. Petitioner's testimony was corroborated by another officer of the corporation, who had also managed some of petitioner's investments, and who testified that the decision to demolish the vacant buildings was made in order to get them off the tax rolls.

Moreover, in the cases relied upon by respondent, it was clear that the purchaser was acquiring the property for some specific use of the underlying land, which use required the removal of the existing buildings. In the instant case, Storz Broadcasting acquired the property as an investment, based on potential increase in value, and had no immediate plans for use of the property which would require the removal of the buildings.[9]

Finally, we can't help but note that the sale by petitioner of the Farnam and Harney Street properties to his wholly owned corporation amounted to a mere transfer of assets from one pocket to another. Since it is clear that these properties, when originally purchased by petitioner, were not acquired with the intent to demolish the buildings, a demolition loss deduction clearly would be allowable to petitioner had he not later transferred the land to Storz Broadcasting. We see no reason why this deduction should be denied merely because of the subsequent transfer of the property from petitioner's personal "pocket" to his corporate "pocket" for continued holding as an investment, in the absence of any intended use by the

---

[9] Although Storz Broadcasting had considered acquiring a radio station which occupied premises adjoining the property in question, the record does not indicate any plans on the part of Storz Broadcasting to utilize the property in question in connection with such potential acquisition.

transferee which would have required removal of the buildings.

> *Decision will be entered under Rule 155 in docket No. 8292–71.*

> *Decision will be entered for petitioner in docket No. 8293–71.*